UNITED STATES ex rel. George ANGE-LET, Petitioner-Appellant,

v.

Honorable Edward M. FAY, as Warden of Green Haven State Prison, Stormville, New York, Respondent-Appellee.

No. 251, Docket 28511.

United States Court of Appeals Second Circuit.

Argued Nov. 21, 1963.

Submitted to the In Banc Court June 1, 1964.

Decided June 11, 1964.

Certiorari Granted Oct. 12, 1964. See 85 S.Ct. 126.

Leon B. Polsky, New York City (Anthony F. Marra, New York City, on the brief), for petitioner-appellant.

Ronald J. Offenkrantz, Asst. Atty. Gen., of the State of New York, New York City (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Samuel A. Hirschowitz, First Asst. Atty. Gen., and Irving Galt, Asst. Solicitor Gen., New York City, on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and MEDINA, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

MEDINA, Circuit Judge (with whom LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, KAUFMAN and HAYS, Circuit Judges, concur):

George Angelet, having exhausted his state remedies, petitioned for federal habeas corpus on the ground that his state court conviction, in 1951, for possession of narcotics with intent to sell, was obtained through admission of evidence allegedly seized in an unreasonable search and seizure prohibited by the Fourth and Fourteenth Amendments. Assuming, *arguendo*, that the search and seizure was conducted in violation of the Constitution, Judge Palmieri nevertheless denied the petition, as he concluded that the exclusionary rule of Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, ought not to be applied retroactively.

After the appeal was heard by a panel consisting of Judges Medina, Waterman and Marshall, the qualified judges of this

Court agreed that the appeal should be considered *in banc*.

■ We have examined the transcript of the trial of Angelet with some care and find the search and seizure was illegal and an invasion of Angelet's constitutional rights. On December 21, 1950 two detectives attached to the Narcotics Squad of the New York City Police Department entered Angelet's apartment by a door opened by a painter who was just leaving. Angelet's rather mild protest was brushed aside, no warrant was produced, and the detectives, together with an agent of the Federal Bureau of Narcotics and his associate, who were summoned by telephone, completely ransacked the apartment. There is nothing to indicate that the officers sought or obtained permission to enter the apartment or that the detectives announced their presence before entering. The search could not have been incidental to an arrest as no arrest was made until after the search had been concluded, when one of the detectives said: "All right, George, you're under arrest. You better get dressed, and put your clothes on."

It was noon when the search was made, and there was no physical coercion, violence or brutality of any kind. Nevertheless, there was a plain and unwarranted invasion of Angelet's home and everything in the apartment was thoroughly rifled and examined. One of the detectives found in a drawer of the dresser fifty-four cellophane envelopes (introduced at the trial as Exhibit 1), one hundred and six empty capsules (Exhibit 2), a stapling machine (Exhibit 3), a box of staples (Exhibit 4), and a scale (Exhibit 5). The federal agent found under a hat four packages (Exhibits 6, 7, 8 and 9). Three of these packages contained heroin and the other contained eighteen capsules of cocaine.

The search of Angelet's apartment, the subsequent trial and the appeal therefrom all occurred after the decision of the Supreme Court in Wolf v. Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, but before the events which directly led to the Supreme Court decision in Mapp v. Ohio, supra, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Thus, it was already clear, at that time, that the Fourteenth Amendment prohibited unreasonable searches and yet it was also plain that the evidence produced by such a search, under the view then prevailing in the Supreme Court, was admissible in a state court prosecution, if state law so provided.

■ Perhaps there is no totally satisfying solution to the exceedingly difficult problem of whether the exclusionary rule announced in Mapp v. Ohio should be applied to all criminal trials which preceded that decision. Compare United States ex rel. Linkletter v. Walker, 5 Cir., 1963, 323 F.2d 11, cert. granted, 1964, 84 S.Ct. 1340, Sisk v. Lane, 7 Cir., 1964, 331 F.2d 235, and Gaitan v. United States, 10 Cir., 1963, 317 F.2d 494, with People v. Hurst, 9 Cir., 1963, 325 F.2d 891, and Hall v. Warden, 4 Cir., 1963, 313 F.2d 483, cert. denied, 374 U.S. 809, 83 S.Ct. 1693, 10 L.Ed.2d 1032. On balance, however, we conclude that neither the purpose of the exclusionary rule nor the sound administration of the criminal law would be advanced by overturning the conviction of Angelet and that no serious philosophical obstacle prevents us from affirming the denial of the writ of habeas corpus.

I

*Preliminary Comment*

It is not surprising that there has been discussion of various phases of the situation from which inferences have been drawn concerning the attitude of the Supreme Court on the question of the retroactivity of Mapp v. Ohio at the time the decision was filed. For example, the Court may have doubted its power to make an *ex cathedra* prediction, and therefore chose not to reach the issue of its power under the Constitution to overrule a prior holding except when necessary to decide an actual case or controversy. See Comment, 1962, 71 Yale L.J. 907, 930–933. It may be that, as the

application of the new doctrine to Miss Mapp was retroactive in the sense that the occurrences took place some years before the decision, logic requires the court to apply the doctrine retroactively as to all persons previously convicted by the admission of such evidence. It has been suggested that review of any conviction which had not yet become final at the time of the Mapp decision could have been the vehicle for overruling Wolf, and that, therefore, it would be unfair to deny relief to the defendants in those cases simply because Wolf was overruled at an earlier date. See United States ex rel. Linkletter v. Walker, supra, 5 Cir., 1963, 323 F.2d 11, 19, cert. granted, 1964, 84 S.Ct. 1340; Bender, The Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 1962, 110 U.Pa. L.Rev. 650, 673–678. Perhaps for this reason, the rule of Mapp v. Ohio has been applied by the Supreme Court on direct review of convictions not yet final at the time Mapp was decided. See Ker v. California, 1963, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; Fahy v. Connecticut, 1963, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; Stoner v. California, 1964, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856.

There has been speculation as to the relevancy to our problem of the circumstance that Wolf was overruled in a case involving direct review of a conviction rather than in a collateral post-conviction proceeding. See Bender, supra, 110 U. Pa.L.Rev. 650, 679 n. 92. Compare Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

It is even argued that this case presents no real question of retroactivity because Wolf v. Colorado, decided before the search of Angelet's apartment, had already made it clear that the search violated Angelet's constitutional rights and Mapp v. Ohio merely removed a procedural bar to the assertion of those rights.

The discussion thus summarized, and there is much more to the same effect, adds up to more or less reasonable guess-work on the subject of the intention lurking in the minds of the learned justices at the time the opinions in Mapp v. Ohio were filed on June 19, 1961. The plain fact remains that none of the opinions gives any sure indication that the Court entertained at the time of filing any view on the subject of general retroactivity. See United States ex rel. Linkletter v. Walker, supra, 5 Cir., 1963, 323 F.2d 11, 15–16 (and cases and other authorities there cited), cert. granted, 1964, 84 S.Ct. 1340. It is far more reasonable to assume that the Court was fully aware of the difficulty of the question and preferred to decide it only after there had been an interval in which courts and legal scholars might have ample time to weigh the pros and cons. We find nothing to the contrary in the quotations from Mapp in Judge Marshall's dissenting opinion herein, including the reference to footnote 9.

As we have concluded that the question has been held open and that the expression of our views will be welcomed, we have filed this opinion although fully aware of the fact that certiorari has been granted in Linkletter.

## II

### *The Philosophical Aspect of the Case*

There are two arguments supporting the view that we have no alternative other than to give general retroactive effect to the exclusionary rule. The first stems from the Blackstonian theory, recently described by this Court as "the splendid myth of 'discovered law,' 1 Blackstone, Commentaries 70." Durocher v. LaVallee, 2 Cir., 1964, 330 F.2d 303, at page 312.

The argument is advanced, on these premises, that one and only one interpretation of the Fourteenth Amendment is correct for all times and, as the most recent interpretation would be the most authoritative, the rule of Wolf v. Colorado, permitting the admission of unlawfully seized evidence, never was law; whereas the rule of Mapp v. Ohio, requiring the exclusion of such evidence, has always been the law. Accordingly, peti-

tioner would have us conclude that he is entitled to the writ on the ground that, at the time of his trial, the admission of the search and seizure evidence violated the Constitution.

■ This theory has been repeatedly criticized (see, e. g., Cardozo, The Nature of the Judicial Process (1921); Levy, Realist Jurisprudence and Prospective Overruling, 1960, 109 U.Pa.L.Rev. 1; Comment, Prospective Overruling and Retroactive Application in the Federal Courts, 1962, 71 Yale L.J. 907; see also Snyder, Retrospective Operation of Overruling Decisions, 1940, 35 Ill.L.Rev. 121) and we think the time has come to reject it. See United States ex rel. Linkletter v. Walker, supra, 1963, 323 F.2d 11; Great Northern Railway v. Sunburst Oil & Refining Co., 1932, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360; Chicot County Drainage District v. Baxter State Bank, 1940, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329. In any realistic view of the case before us, the law, both state and federal, at the time of the trial of Angelet made admissible the evidence procured by the unreasonable search and seizure. For that reason we cannot construe Angelet's failure to object to the evidence as a waiver.

■ The other argument is, we are here dealing with a constitutional question, and we have no alternative other than to give the new doctrine the widest possible scope. It is pointed out that where constitutional rights are violated prejudice is presumed.[1] It is our view, however, that the development of constitutional law calls into play precisely the same operations of the judicial process as does the development of a body of decisional law in any other field. The extent to which the new doctrine is to be applied should depend, in the language of Mr. Justice Cardozo, upon "considerations of convenience, of utility, and of the deepest sentiments of justice." United States ex

rel. Linkletter v. Walker, supra, 5 Cir., 1963, 323 F.2d 11, footnote 5, cert. granted 1964, 84 S.Ct. 1340. There is no rule of thumb, nor should there be. It is the burden of this opinion to attempt to demonstrate that, by Mr. Justice Cardozo's test, the Mapp v. Ohio doctrine should not be given general retroactive effect.

As we view the problem, there is now at stake one of the most important principles of constitutional interpretation. It has been the proud boast of the most distinguished of our American jurists that the federal Constitution, and especially the Bill of Rights, including the Fourteenth Amendment, is not a rigid aggregation of fundamental rules but a dynamic and flexible document, to be interpreted from time to time to conform to the social and economic needs of a changing society in a modern world. See, e. g., Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Mr. Chief Justice Warren); United States v. Classic, 1941, 313 U.S. 299, 315–316, 61 S.Ct. 1031, 85 L.Ed. 1368 (Mr. Justice Stone); Olmstead v. United States, 1928, 277 U.S. 438, 471–479, 48 S.Ct. 564, 72 L.Ed. 944 (Mr. Justice Brandeis dissenting); Gompers v. United States, 1914, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115 (Mr. Justice Holmes); Weems v. United States, 1910, 217 U.S. 349, 373–374, (Mr. Justice McKenna); McCulloch v. Maryland, 1819, 17 U.S. 316, 407, 415 (Mr. Chief Justice Marshall); Martin v. Hunter's Lessee, 1816, 14 U.S. 304, 326–327, (Mr. Justice Story). We shall return to this subject later.

■ We do not doubt the power of the judicial establishment to decide that the doctrine of Mapp v. Ohio is to be given general retroactive effect, or to decide that it is not to be given general retroactive effect. There is no philosophical obstacle to a decision either way.

---

[1] See United States v. Plattner, 2 Cir., 1964, 330 F.2d 271, 273; Coplon v. United States, 1951, 89 U.S.App.D.C. 103, 191 F.2d 749, 758–60, cert. denied, 1952, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690; Fina v. United States, 10 Cir., 1931, 46 F.2d 643.

But there must be a rational basis for that decision.

We proceed to come to grips with the heart of the problem as best we may, and all too conscious of the fact that we may have been misled by the marks we have found to guide us.

### III

*The Primary Reason for the Decision in Mapp v. Ohio Was to Deter Illegal Searches and Seizures in the Future*

Basic to the application of Mapp v. Ohio to other situations, such as the one now before us, is the ascertainment of the reasons behind the decision. The principal reason, we think, is disclosed not only on the face of the opinions in Mapp v. Ohio, but in what appears on the face of the opinions written in the series of cases leading up to the holding in Mapp v. Ohio and this principal reason is to deter police misconduct. It thus removes the incentive to violate the Constitution in just those proceedings in which the outcome is of special interest to the officials who would conduct or direct an illegal search.

As the rule of Mapp v. Ohio is essentially an extension of the rule of Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, under which evidence seized in violation of the Fourth Amendment was excluded from federal criminal trials, we think it relevant to consider Judge Learned Hand's succinct summary of the purpose of the rule.

> "As we understand it, the reason for the exclusion of evidence competent as such, which has been unlawfully acquired, is that exclusion is the only practical way of enforcing the constitutional privilege. In earlier times the action of trespass against the offending official may have been protection enough; but that is true no longer. Only in case the prosecution which itself controls the seizing officials, knows that it cannot profit by their wrong, will that wrong be repressed." United States v. Pugliese, 2 Cir., 1945, 153 F.2d 497, 499.

State courts which rejected the common law rule of admissibility and adopted the exclusionary rule prior to the decision of the Supreme Court in Mapp v. Ohio placed similar emphasis on the deterrent rationale. For example, Justice Traynor, in a scholarly analysis written for the Supreme Court of California in the landmark case of People v. Cahan, 1955, 44 Cal.2d 434, 282 P.2d 905, declared that the court was "compelled" to reach the conclusion that evidence obtained in violation of the constitutional guarantees is inadmissible

> "because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers.

> \* \* \* \* \* \*

> "Granted that the adoption of the exclusionary rule will not prevent all illegal searches and seizures, it will discourage them. Police officers and prosecuting officials are primarily interested in convicting criminals. Given the exclusionary rule and a choice between securing evidence by legal rather than illegal means, officers will be impelled to obey the law themselves since not to do so will jeopardize their objectives." 44 Cal.2d 434, 282 P.2d 905, at 911–912, 913.

In a similar vein, the Criminal Court of Appeals of Oklahoma expressed its views as follows:

> "If these governmental agencies, contrary to the letter and the spirit of our Constitution, are encouraged or condoned by the courts in their invasion of the privacy of homes, offices and places of business, forcibly and without invitation, for the purpose of procuring evidence to convict one of some misdemeanor, the practice followed to its logical conclusion will make our vaunted

freedom a mere pretense, valueless, and without substance. Whenever the courts actively encourage officers to procure evidence illegally by force, the officers soon become dictatorial, arrogant, and even brutal—a natural consequence of the courts' approval of obtaining evidence illegally by force." Gore v. State, 1923, 24 Okl. Cr. 394, 218 P. 545, 550.

In State v. Owens, 1924, 302 Mo. 348, 259 S.W. 100, 32 A.L.R. 383, the Supreme Court of Missouri summed up its reason for excluding evidence obtained in an illegal search in the following sentence:

"The question is not whether the defendant can be redressed in his case upon trial, but whether the reckless officer may be encouraged by the approval of the court to repeat the trespass." 259 S.W. at 109.

The most authoritative source from which we derive our understanding of the decision in Mapp v. Ohio is, of course, the Supreme Court of the United States. In Wolf v. Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, the Supreme Court made it clear for the first time that "the core of the Fourth Amendment" is applicable to the States through the due process clause of the Fourteenth Amendment. Nevertheless, the Supreme Court was reluctant to read the federal exclusionary rule into the minimal requirements of the Fourteenth Amendment until those States which admitted unlawfully seized evidence had been allowed an opportunity to adopt the exclusionary rule or develop other methods of effectively enforcing the right of the people to be secure against arbitrary intrusions into their privacy by the police. See Irvine v. California, 1954, 347 U.S. 128; also

Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

 Not until the experience of California, as well as that of other states, had demonstrated that alternative criminal and civil remedies "have been worthless and futile," 367 U.S. at 652, 81 S.Ct. 1684, did the Supreme Court, in Mapp v. Ohio, finally impose the exclusionary rule on the States as a constitutional mandate. In the Mapp opinion itself, the Supreme Court repeated the language it had used in Elkins v. United States, 1960, 364 U.S. 206, 217, 80 S.Ct. 1453, stating "that the purpose of the exclusionary rule 'is to deter—compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" 367 U.S. at 656, 81 S.Ct. at 1692. Mr. Justice Harlan, in his dissenting opinion, agreed that the exclusionary rule as applied in the federal courts under the doctrine of Weeks v. United States, supra, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, "is but a remedy which, by penalizing past official misconduct, is aimed at deterring such conduct in the future." 367 U.S. at 680, 81 S.Ct. at 1705. Again, in Fahy v. Connecticut, supra, 1963, 375 U.S. 85, at page 94, 84 S.Ct. 229, Mr. Justice Harlan, joined by Mr. Justice Clark, Mr. Justice Stewart and Mr. Justice White, the only members of the Court to reach the issue of whether the admission of unconstitutionally seized evidence could be regarded as harmless error where it did not affect the outcome of the trial, reaffirmed the view that the basis of the Mapp rule lies in its "prophylactic function" of preventing prosecutors from using unconstitutionally obtained evidence to secure a conviction.[2]

---

2. We do not believe that the exclusionary rule of Mapp v. Ohio is based on the right not to be a witness against oneself in a criminal trial. Nearly two months prior to the decision in Mapp v. Ohio, the Chief Justice, Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Brennan, in dissenting opinions, clearly had taken the position that the Fifth Amendment privilege against self-incrimination is included within the due process clause of the Fourteenth Amendment. See Cohen v. Hurley, 1961, 366 U.S. 117, 131–160, 81 S.Ct. 954, 6 L.Ed.2d 156. Yet only Mr. Justice Black relied on incorporation of the Fifth Amendment into the Fourteenth Amendment to support the decision in Mapp v. Ohio. The Chief Justice, Mr. Justice Douglas, who also concurred in a separate opinion, and Mr.

Having thus concluded that the course of decision in the Supreme Court demonstrates that the primary purpose of the exclusionary rule is to deter searches and seizures that violate the Fourteenth Amendment, as construed with the Fourth Amendment, we think this purpose is sufficiently, if not completely, served by refusing to apply the rule to searches and seizures long prior to the decision in Mapp v. Ohio or the occurrences involved in that case. United States ex rel. Linkletter v. Walker, supra, 5 Cir., 1963, 323 F.2d 11, cert. granted, 1964, 84 S.Ct. 1340; Bender, The Retroactive Effect of an Overruling Decision: Mapp v. Ohio, 1962, 110 U.Pa.L.Rev. 650; Traynor, Mapp v. Ohio at Large in the Fifty States, 1962, Duke L.J. 319.

## IV

*The State of New York Has a Legitimate Interest in the Execution of a Judgment Based Upon Evidence Not Found to Be Untrustworthy After a Trial Not Tainted by Any Fundamental Unfairness*

The rationale of Mapp v. Ohio, as we see it, is that a State will no longer be permitted to employ a procedure that is harmful to the security of the community at large because it fosters an incentive to the police to conduct unreasonable searches and seizures in violation of established principles of constitutional law. It is noteworthy that the new exclusionary principle does not arise out of any claim that the evidence that was admitted is untrustworthy or that the trial was tainted by some fundamental unfairness in regard to the interests of the particular defendant. Indeed, the compact logic of Judge Kaufman's opinion in Durocher v. LaVallee, 2 Cir., 1964, 330 F.2d 303, points up the difference between giving retroactive effect to Gideon and giving retroactive effect to Mapp.[3]

Justice Brennan joined in the opinion of Mr. Justice Clark and placed no reliance on the Fifth Amendment.

Similarly, Mr. Justice Murphy and Mr. Justice Rutledge, who had both previously taken the position that the Fifth Amendment is incorporated in the Fourteenth Amendment, see Adamson v. California, 1947, 332 U.S. 46, 123–125, 67 S.Ct. 1672, 91 L.Ed. 1903, did not rely on the Fifth Amendment right in their dissenting opinions in Wolf v. Colorado. Instead, they asserted that the exclusionary rule, because of its deterrent function, is necessarily a part of the Fourth Amendment and therefore binding on the States through the Fourteenth Amendment.

The reason would seem to be that "[t]he sole—although deeply valuable—purpose of the Fifth Amendment privilege against self-incrimination is the security of the individual against the exertion of the power of the * * * Government to compel incriminating testimony * * * to convict a man out of his own mouth." Knapp v. Schweitzer, 1958, 357 U.S. 371, 380, 78 S.Ct. 1302, 1308, 2 L.Ed.2d 1393.

Thus, even if the Supreme Court were to hold that the Fourteenth Amendment prohibits the States from compelling an individual to be a witness against himself, and even if that decision were held to be retroactive, we do not believe such a decision would govern the question of the retroactivity of Mapp.

3. Footnote 3 on page 310 of Durocher reads:

"In determining whether a decision is to be retroactively applied, commentators have often suggested a test based on whether the underlying 'purpose' of that decision would be served thereby. See, e.g., Comment, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907 (1962). Under such an analysis, for example, a distinction might be drawn between Gideon and a case such as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It might be argued, in this regard, that the exclusionary rule of Mapp is not designed to protect the 'fairness' of the actual trial, but rather to serve as a deterrent to oppressive police conduct. If this is true, it might be maintained that Mapp has less of a claim to retroactive application than does Gideon, since Mapp could hardly be expected to 'deter' searches which took place prior to the date of its decision. See United States ex rel. Linkletter v. Walker, 323 F.2d 11 (5th Cir. 1963). It is not now necessary to express any view as to the validity of this sort of analysis, and we expressly disclaim any intention here to decide whether Mapp is to be retroactively applied. Consid-

■ ■ As the interests of society that the rule of Mapp v. Ohio is designed to protect are not advanced by general retroactive application of the rule, we think it proper to accord fair weight to the interest of society in effective enforcement of the criminal law. A review of the trial minutes confirms that there is no reasonable doubt that Angelet is guilty of the serious crime for which he was convicted. In the absence of any fundamental unfairness to the defendant, or doubt as to the reliability of the evidence admitted, it seems clear that the People of the State of New York have a definite and legitimate interest in seeing that the sentence imposed upon him is fully executed.

Moreover, the effect of a ruling that the exclusionary rule affects all past convictions based upon evidence illegally procured is likely to be chaotic. See Warring v. Culpoys, D.C.Cir., 1941, 122 F.2d 642, 647, cert. denied, 314 U.S. 678, 62 S.Ct. 184, 86 L.Ed. 643. For example, as such evidence was freely admissible in New York, pursuant to rulings of the Supreme Court, in how. many of such convictions did the prosecution rely solely upon the evidence illegally procured, with perhaps some corroboration, without offering other incontrovertible proofs, not now available due to the death of witnesses or other circumstances, because such proofs would have been merely cumulative?

We have grave doubt that a proper deference to the general control of a State over the administration of the criminal laws warrants such intrusion into the past, where there is no reason to doubt that the guilty have been brought to book and the trial leading to the conviction was based upon no fundamental unfairness such as exists in those cases where the right of defendants to counsel has been infringed or coerced confessions have been received in evidence. In such cases "an insistence that a defendant establish the extent of prejudice which he has suffered would obviously be futile." United States v. Guerra, 2 Cir., (1964), 334 F.2d 138, 146, n. 4.

## V

### A Holding of General Retroactivity Would Seriously Impair the Further Development of Constitutional Law on the Subject of Illegal Searches and Seizures

The right to privacy, and the development of new and much needed interpretations of the Fourth and Fourteenth Amendments, is one of the most pressing social problems of modern times in America. See generally Packard, The Naked Society (1964) 63 Colum.L.Rev. 955 (1963). It is not too much to say that wire-tapping and electronic eavesdropping have become so widespread and are so ingeniously contrived that new and perhaps far-reaching rulings will be made regulating such matters in the not too distant future. The whole subject of illegal searches and seizures is in such a state of vagueness and confusion that it has been stated that law enforcement officers have few sure guides and are at a loss to know what they may lawfully do and what they may not lawfully do. Lumbard, The Administration of Criminal Justice, 1963, 49 A.B.A.J. 840, 842.

If it is to be held that the exclusionary rule of Mapp v. Ohio is to be given general retroactive effect, how is a similar holding to be withheld with respect to every new interpretation of the Fourth and Fourteenth Amendments? Indeed, the basic reasoning of the dissent in this case is to the effect that any change in constitutional interpretation must be given retroactive effect. Such a rule would add rigidity to a decisional process that traditionally over the years has been flexible, and would thus inevitably to some extent postpone the much needed further development of constitutional law

erations of this sort do, however, indicate that Gideon and Mapp present quite different questions, and that a holding that the former is retroactive by no means compels a similar result when the latter issue is before us."

on a subject so close to the hearts of the people. Moreover, it cannot be assumed that all overrulings of prior decisions will be of such a character as to provide a basis for new trials and possible reversals of convictions in criminal cases. Suppose, for example, the rule of exclusion now under consideration were to be changed later by the overruling of Mapp v. Ohio, how could such a holding be given retroactive effect, if in the meantime large numbers of persons previously convicted under the rule admitting such evidence had been released?

In other words, the drawing of lines of distinction between different types of cases seems to us to be of the essence of the judicial process.[4] The word "constitutional" is not to be given some talismanic effect, irrespective of consequences. In Gideon the proceedings leading to conviction were tainted with an infringement of rights of the defendant so serious as to demonstrate that these proceedings were essentially unfair and hence could not and did not meet the requirements of due process of law. The reasoning of Judge Kaufman in the Durocher opinion makes this as clear as crystal. In the case now before us there is no such taint of essential unfairness.

With due respect for the views of our brothers of the Third Circuit, we do not agree with Judge Hastie's dictum in United States ex rel. Craig v. Myers, 3 Cir., 1964, 329 F.2d 856, 859, quoted in Judge Marshall's dissent herein. The result arrived at in Myers is the same as the one we reached in Durocher, but the dictum, as we read it, does no more than restate in different words the Blackstonian theory that we have already rejected.

In conclusion, there are certain general policy considerations that we think make it generally undesirable to give retroactive effect to overruling decisions, except under the most compelling circumstances.

It has for generations been part of the formulary of *stare decisis* and *res judicata* to leave the history of the past undisturbed and to sustain the finality of judgments long since recorded. This is due in no small measure to the fact that witnesses die, documentary and other proofs are destroyed or otherwise become unavailable, and the retroactive application of overruling decisions involves of necessity an unequal and discriminatory result in individual cases. Added to this is the burden on judicial administration. True, the added burden must be borne in cases where old convictions are the fruit of trials tainted by some fundamental unfairness within the orbit of constitutional law, but not, we think, in cases such as the one we now decide.

The order below is affirmed.

MARSHALL, Circuit Judge (with whom SMITH, Circuit Judge, concurs), dissenting:

I respectfully dissent. I cannot, and as I read the opinion in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), we may not restrict its application to illegal searches and seizures, or convictions based upon illegally seized evidence, occurring after that decision. "It is significant that the Supreme Court did not specifically declare that the effect of its decision was to operate only in the future, as it might have done." Hall v. Warden, 313 F.2d 483, 496 (4 Cir. 1963). We are not free to circumscribe the application of a declared constitutional right.

The majority finds "the search and seizure was illegal and an invasion of Angelet's constitutional rights." There is no question of the jurisdiction of the trial court and this court to pass upon the merits of the petition. Why, then, should not this conviction based upon evidence admittedly obtained by an invasion of petitioner's constitutional rights, be

4. The lines of demarcation drawn between cases at the periphery of any rule may frequently appear to be somewhat arbitrary. Nevertheless, in our opinion, the fact that the mitigating considerations,

discussed in the Preliminary Comment of this opinion, that favored applying the Mapp rule in Ker, Fahy and Stoner are absent in Angelet provides a rational basis for distinguishing those cases.

subject to the usual form of post-conviction relief? Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). I believe it should, for the reasons set out below.

The scholarly majority opinion cites and discusses everything from Blackstone to Cardozo, from state court cases to a Learned Hand opinion to occasional expressions in other opinions of the Supreme Court in its philosophical quest for the elusive "purpose" of the exclusionary rule set out in Mapp. By contrast, I believe that the starting point of the inquiry must be the text of the Mapp opinion. And I believe that a careful examination of that text will show two things: first, that the exclusionary rule, whatever its supposed "purpose," is a fundamental constitutional guarantee and personal right of an accused and second, that the Supreme Court considered the issue of retroactivity and did not shrink from it.

The majority opinion in Mapp v. Ohio concluded:

"The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest. Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, *gives to the individual no more than that which the Consti-*

*tution guarantees him,* to the police officer no less than that to which honest law enforcement is entitled, and to the courts, that judicial integrity so necessary in the true administration of justice." 367 U.S. at 660, 81 S.Ct. at 1694. (Emphasis added.)

The majority opinion is premised upon the proposition that the primary reason for the Mapp decision was to deter illegal searches and seizures in the future. This premise completely ignores the actual effect of Mapp in overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). The Mapp decision declared and defined the constitutional right of a defendant not to be convicted upon illegally seized evidence. All the arguments concerning the deterrent effect inherent in cases following Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) were discussed by Mr. Justice Clark in Mapp. After this discussion he recognized the constitutional right involved and stated:

Indeed, we are aware of no restraint, similar to that rejected today, conditioning the enforcement of any other basic constitutional right. The right to privacy, no less important than any other right carefully and particularly reserved to the people, would stand in marked contrast to all other rights declared as "basic to a free society." Wolf v. Colorado, supra, 338 U.S. at 27, 69 S.Ct. at 1361. This Court has not hesitated to enforce as strictly against the States as it does against the Federal Government the rights of free speech and of a free press, the rights to notice and to a fair, public trial, including, as it does, the right not to be convicted by use of a coerced confession, however logically relevant it be, and without regard to its reliability. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). And nothing could be more certain than that when a coerced confession is involved, "the relevant rules of evi-

dence" are overridden without regard to "the incidence of such conduct by the police," slight or frequent. Why should not the same rule apply to what is tantamount to coerced testimony by way of unconstitutional seizure of goods, papers, effects, documents, etc.? We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an "intimate relation" in their perpetuation of "principles of humanity and civil liberty [secured] * * * only after years of struggle," Bram v. United States, 168 U.S. 532, 543-544, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). They express "supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy." Feldman v. United States, 322 U.S. 487, 489-490, 64 S.Ct. 1082, 1083, 88 L.Ed. 1408 (1944). The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence. Cf. Rochin v. California, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952). 367 U.S. at 656-657, 81 S.Ct. 1684.

The simple fact is that, in the view of the Supreme Court, the right not "to be convicted on unconstitutional evidence," is a fundamental ingredient of the due process of law guaranteed state criminal defendants by the 14th Amendment to the Constitution of the United States. However, the majority in this case, by focussing almost exclusively on a supposed "purpose" which it attributes to the exclusionary rule has obscured this basic point.

Again looking to the text of the Mapp opinion, which the majority scarcely mentions, we find footnote 9, at 367 U.S. 659, 81 S.Ct. at 1693:

"As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected. We note, moreover, that the class of state convictions possibly affected by this decision is of relatively narrow compass when compared with Burns v. State of Ohio, 360 U.S. 252 [79 S.Ct. 1164, 3 L.Ed.2d 1209]; Griffin v. People of State of Illinois, 351 U.S. 12 [76 S.Ct. 585, 100 L.Ed. 891] and Commonwealth of Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116 [76 S.Ct. 223, 100 L.Ed. 126]. In those cases the same contention was urged and later proved unfounded. In any case, further delay in reaching the present result could have no effect other than to compound the difficulties."

Two points are unmistakably clear about this footnote. First, the likelihood of retroactive application was clearly before the Court. Otherwise why cite such cases as Burns, Griffin and Herman, which could "affect" state convictions only if they were given retroactive effect? Second, to the extent that the footnote conditions application of the new doctrine on state procedural grounds, it no longer represents the law. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L. Ed.2d 837 (1963). Thus, the only real comfort for the majority comes from the use of the word "possibly." But this may refer to a number of matters, e. g., the state procedural grounds discussed above, or the possibility that few convictions were in fact obtained by use of unconstitutionally seized evidence, which would tend to limit the Mapp holding's effect on existing convictions without impairing its retroactivity under other conditions. I believe that footnote 9, taken in context, reflects an intention that the rule of the case be applied to past as well as future convictions.

Next to the Mapp opinion itself, the most authoritative source of guidance is what the Court has done in similar situations. Without exception, retroactive application has been given to the principles of constitutional law developed over the years. Only a few months ago, as we pointed out in U. S. ex rel. Durocher v. LaVallee, 330 F.2d 303 (1964), the Supreme Court reversed a 1959 Ohio conviction, based on a guilty plea entered without counsel, on the basis of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), Doughty v. Maxwell, 376 U.S. 202 (1964). See also House v. Mayo, 324 U.S. 42, 65 S. Ct. 517, 89 L.Ed. 739 (1945). Again, in Eskridge v. Washington State Board of Parole, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958) the Court applied Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) involving the right of an indigent to a transcript for the purpose of taking an appeal without payment of fees, to a 1935 conviction.[1] See also Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959); Douglas v. Green, 363 U.S. 192, 80 S.Ct. 1048, 4 L.Ed.2d 1142 (1960); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961); Lane v. Brown, 372 U.S. 477, 483, 83 S.Ct. 768, 9 L.Ed. 2d 982 (1963).[2]

The Supreme Court has also given retroactive application to the increasingly stringent tests employed by it in evaluating the voluntariness of confessions. In Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), the court ordered the release of Reck, a prisoner convicted in 1937, when it found that the circumstances of obtaining a confession were inherently coercive in the light of such cases as Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) and Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949), all of which were decided many years after Reck's trial. Indeed, the District Court which held a hearing on Reck's petition recognized that, under the present-day standards expounded in the above and other cases, the confession would have to be excluded, but declined to apply those cases retroactively. See United States ex rel. Reck v. Ragen, 172 F.Supp. 734, 747 (N.D.Ill.1959). The Supreme-

---

1. It is true that in Norvell v. Illinois, 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963), the Court affirmed a decision of the Illinois Supreme Court that denied an indigent prisoner a transcript of his 1941 trial, where the court reporter had died in the interim and it was impossible to transcribe his notes or reconstruct the evidence from the testimony of witnesses. The prisoner had a lawyer at his trial, who did not pursue an appeal, and was apparently not requested to do so at that time. The Court's decision was based on the narrowest possible ground, saying that "where transcripts are no longer available, Illinois may rest on the presumption that he who had a lawyer at the trial had one who could protect his rights on appeal." Mr. Justice Goldberg, for himself and Mr. Justice Stewart, dissented. They believed that the Illinois state court erred in holding that Griffin operated "prospectively and not retroactively, in the sense that it invalidated only 'existing financial barriers' to appeal." Thus, that court did not reach the question whether Griffin had been deprived of his constitutional rights in 1941. The dissenters urged that, although the majority opinion did not go off on this analysis, the case should nevertheless be remanded for reconsideration in the light of the correct interpretation of Griffin, which was that it was fully retroactive. "Griffin was a constitutional decision vindicating basic Fourteenth Amendment rights and is no more to be restricted in scope or application in time than other constitutional judgments." 373 U.S. at 425, 83 S.Ct. at 1369.

2. The Supreme Court has applied the exclusionary rule to three cases which involved the legality of searches conducted before the date of the decision in Mapp. Stoner v. California, 376 U.S. 483, 84 S. Ct. 889, 11 L.Ed.2d 856 (1964); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed. 2d 726 (1963).

Court's opinion did not even allude to the problem of retroactivity.

The confession cases are a particularly persuasive analogy, not only because of their discussion in the Mapp opinion, but also because in them, as in the cases arising under the Mapp decision, there is often no doubt whatever of the defendant's guilt. The traditional basis for excluding confessions obtained under duress may have been their unreliability. But if any principle is clear in this area, it is that the presence of corroborative independent evidence of guilt should have no bearing on the federal court's consideration of the issue of coercion in a habeas corpus proceeding. See Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Rogers v. Richmond, supra.

The only distinction between the confession cases and the one before us is that the former did not involve overruling prior precedents. But this is a distinction which makes no difference. Surely the state cannot here claim any "good faith reliance" on the Wolf doctrine. It was on notice, at Angelet's trial, that the narcotics introduced into evidence had been seized in violation of the defendant's constitutional rights under the Fourteenth Amendment. It was on notice that the Supreme Court did not condone this procedure, and looked to the states to provide adequate corrective process. It was on notice that no such process had been provided.

But even if we assume that some importance should be accorded the fact that Mapp was an overruling decision, we must still weigh the interest of the state in relying on the Wolf decision at this time against the interest of the petitioner in not being confined under a judgment secured through the use of unconstitutional evidence. We now know that Angelet's trial was tainted by error of constitutional dimensions, although this was not known at the time. He is still suffering the consequences of that error —deprivation of his liberty. The writ of habeas corpus is available as a means of rectifying that deprivation. As Judge Hastie well stated, in the recent case of United States ex rel. Craig v. Myers, 329 F.2d 856, 859 (3 Cir. 1964):

"In actuality, all criminal convictions, all appellate judgments reversing convictions and, most notably, all judgments sustaining collateral attacks on convictions impose legal consequences upon the basis of the court's present legal evaluation of past conduct. It is irrelevant that the judge's views of what constitutes a denial of due process may have changed since the occurrence of the events in suit, or that he or some other judge might have rendered a different decision had the same matter reached his court years earlier. The petitioner is entitled to the most competent and informed decision the judge can now make whether there was fundamental unfairness in his past conviction. Our system is not so unenlightened as to require that in attaching present consequences to 1931 occurrences, a judge must ignore all of the insight that men learned in the law and observant of human behavior have acquired concerning the essentials of tolerable criminal procedure during the past 30 years."

I do not believe it is possible to draw lines between the several constitutional rights guaranteed by the 14th Amendment as interpreted by the Supreme Court of the United States. How can the right not to be convicted on unconstitutionally seized evidence not be deemed "fundamental," when the Court was willing to overrule a prior decision to establish it? The majority provides no satisfactory answer.

Moreover, I believe that the thrust of the Craig case, which, to put the matter quite baldly, requires a federal judge acting on a petition for habeas corpus to judge the constitutional validity of a state prisoner's confinement by assuming that the trial was held on the very day that he is considering the petition, is a necessary implication of Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9

L.Ed.2d 837 (1963). I might note first that this decision will doubtless result in the release of far more state prisoners than those entitled to relief under Mapp. The "adequate state ground" doctrine was unquestionably the largest single limitation on federal habeas corpus relief, and it no longer exists. It was destroyed because of the Court's belief that a forum must be provided for the vindication of constitutional claims.

"The breadth of the federal courts' power of independent adjudication on habeas corpus stems from the very nature of the writ, and conforms with the classic English practice. * * * It is of the historical essence of habeas corpus that it lies to test proceedings so fundamentally lawless that imprisonment pursuant to them is not merely erroneous but void. Hence, the familiar principle that res judicata is inapplicable in habeas proceedings * * * is really but an instance of the larger principle that void judgments may be collaterally impeached. * * * So also, the traditional characterization of the writ of habeas corpus as an original * * * remedy for the enforcement of the right to personal liberty, rather than as a stage of the state criminal procedings or as an appeal therefrom, emphasizes the independence of the federal habeas proceedings from what has gone before. This is not to say that a state criminal judgment resting on a constitutional error is void for all purposes. But conventional notions of final-

ity in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review." Fay v. Noia, 372 U.S. at 422–423, 83 S.Ct. at 840.

To be sure, Fay v. Noia did not directly involve the question of retroactive application of substantive principles of constitutional law, as distinguished from the procedural mechanisms whereby they may be asserted.[3] But if the federal writ of habeas corpus is to issue to redress a constitutional deprivation and terminate a detention despite the fact that state procedures could have been employed, then I can see no reason for declining to issue the writ where, during the course of a detention, it becomes clear that fundamental error was committed at the trial. The Court in Noia focussed almost exclusively on the fact of deprivation of liberty, and insisted that the federal courts be at all times prepared to restore liberty if the circumstances warranted.

A final practical difficulty with the majority approach to this case is that it presents the courts with the necessity of fixing an arbitrary date when the Mapp rule must begin to take effect. If the "deterrence" rationale is followed in all its implications, the Mapp should apply only to convictions involving evidence seized after the date of its decision. As the majority recognizes, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11

---

3. It is noteworthy, however, that in footnote 35 of the Noia opinion, Mr. Justice Brennan cast doubt on the precedential importance of Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), which held that a prisoner who did not appeal his conviction for violation of the Selective Training and Service Act, might not obtain habeas corpus. The trial court there had held that no challenge to validity of the defendant's classification might be lodged at trial, a position later rejected by the Supreme Court. Mr. Justice Brennan noted that the Sunal opinion "ex-

pressly excluded errors so grave that they 'cross the jurisdictional line', * * * and implied that the claimed error was not even of constitutional dimension." He then cross-referred to previous pages in the opinion which noted the habeas relief has often been denied "upon allegations merely of error of law and not of a substantial constitutional denial" and that "such decisions are not however authorities against applications which invoke the historic office of the Great Writ to redress detentions in violation of fundamental law."

L.Ed.2d 171 (1963) and Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L. Ed.2d 856 (1964), preclude this result. If a state court should nevertheless admit such evidence in a post-Mapp trial, no one could possibly contend that federal habeas corpus would not lie. The same three cases also indicate that, even as to pre-Mapp convictions, Mapp must be applied by state appellate courts which review such convictions after the decision, a result that does not in any way further "deterrence." To this extent, the purity of the majority's "ideal" view of Mapp has necessarily been compromised.

Next comes the question, already before this court, of an affirmance before Mapp but a petition for rehearing of the appeal afterward. If the petition is timely filed and denied, can there be much doubt that the Mapp issue is open on habeas corpus? Then, too, suppose that a defendant had lost his appeal in an intermediate state court and sought discretionary review in the highest court after Mapp came down. If this is refused, is the prisoner entitled to federal habeas corpus relief? If yes, should it really matter whether the order came on the Friday before Mapp was handed down, or the Tuesday afterward? Still other variations on the theme are possible, but I do not think it necessary to set them out. The point is simply that, under the majority approach, assertion of fundamental rights will depend on strained distinctions and accidents of timing which, I submit, have no place in the orderly administration of law.

Alternatively, the majority seems to suggest that convictions based on evidence illegally seized on or after the seizure date in Mapp, May 13, 1957, would be subject to habeas corpus relief but convictions on evidence illegally seized prior to that date would be immune. " * * * We think this purpose is sufficiently, if not completely served by refusing to apply the rule to seizures long prior to the decision in Mapp v. Ohio or occurrences involved in that case * * *" To make the con-

stitutional rights of prisoners throughout the nation depend on when three Cleveland police officers happened to conduct a routine investigation, rather than on what the Supreme Court has said and done, is, to me at least, the height of unreason.

It may be objected that these problems do not arise in this particular case. But they are present in several appeals now pending in this very court, and are undoubtedly involved in many habeas corpus petitions now in the district courts of this and other circuits. I submit that the effect of the majority decision will be only to confuse the issues further. I believe we should say here, as we did in Durocher, supra, "against such casuistry, we hasten to add our simple point: Constitutional rights should not depend on arcane logic or trivial events." 330 F.2d 303, 310 n. 4.

The majority here puts its greatest stress on the alleged interest of the State of New York in insisting on Angelet serving his sentence and fears of other convicted criminals being released. Constitutional rights are personal and may not be so conditioned or balanced away. New York's interest in enforcing its criminal laws is limited by the Constitution of the United States. At least since Wolf v. Colorado, supra, New York has been on notice that evidence of the type used to convict Angelet was illegally seized in violation of his constitutional rights. This evidence was knowingly introduced by the State. The judgment based upon this illegally seized evidence was pronounced by the State. The State has refused to correct this. After Mapp there is clearly no constitutionally recognized interest of the State of New York to continue this illegal detention of Angelet. Why is the conviction of Angelet any more immune from attack than the conviction of Miss Mapp? Perhaps the answer is suggested by the majority's argument in favor of *stare decisis* and *res judicata*. However, to hold that habeas corpus is available to challenge a conviction based on illegally seized evidence in violation of constitutional rights

would actually be an application of *stare decisis*, for the reasons set out above. "Moreover, our holding that the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments is not only the logical dictate of prior cases, but it also makes very good sense." Mapp v. Ohio, 367 U.S. at 657, 81 S.Ct. at 1693.

I would reverse the judgment below and direct the writ to issue, subject to the right of the State to order an immediate retrial of the prisoner if it be so advised.