Joseph H. LYONS and Jessie H. Lyons, individually and as copartners doing business under the name and style of Lyons Electrical Distributing Company, Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPORATION and General Electric Company, Defendants.

United States District Court
S. D. New York.

Oct. 13, 1964.

Copal Mintz, New York City, for plaintiffs.

Cravath, Swaine & Moore, New York City, for defendant Westinghouse Elec. Corp., Bruce Bromley, Arnold I. Roth, New York City, of counsel.

Simpson Thacher & Bartlett, New York City, for defendant General Elec. Co., Albert C. Bickford, Albert X. Bader, Jr., New York City, of counsel.

McLEAN, District Judge.

This is a private treble damage antitrust action. Plaintiffs charge that defendants Westinghouse Electric Company ("Westinghouse") and General Electric Company ("General Electric") have conspired and combined to restrain and monopolize interstate commerce in electric lamps, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and to enforce exclusive dealing in such lamps, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14). Plaintiffs further assert that, without regard to any agreement or concert of action between them, each defendant, acting individually, has violated each of these statutes. Plaintiffs claim that defendants' illegal conduct has caused plaintiffs damage in the amount of $1,250,000 which, when trebled, amounts to $3,750,000, for which recovery is sought against both defendants. Plaintiffs also claim as against Westinghouse alone an additional item of damage of $180,000 which, when trebled, adds $540,000 to the claim against Westinghouse.

There is no doubt that both defendants have sold lamps in interstate commerce. It is conceded that this court has jurisdiction of the subject matter of this action and of the parties.

The parties have submitted voluminous findings of fact. Those submitted by Westinghouse are the most exhaustive. I have adopted the Westinghouse findings in the main, after checking them against the record, amending them where necessary or desirable, and eliminating those findings which are argumentative. I shall not repeat here all the many facts embodied in these detailed findings. The purpose of this opinion is to outline as briefly as possible the issues involved in this litigation, to summarize the essential facts which relate to those issues, and to record the reasons which have led me to the conclusions which I have reached concerning them.

From June 1944 to December 1951 plaintiffs, husband and wife, were partners doing business as Lyons Electrical Distributing Company ("Ledco"). Joseph Lyons was the dominant partner, in complete control of the business, hence to all intents and purposes we have here a single plaintiff. I shall frequently refer to plaintiffs, in the course of this opinion, as Ledco.

Ledco was a so-called B agent of Westinghouse, engaged in distributing electric lamps, known colloquially as light bulbs. Ledco also distributed lamps manufactured by a wholly separate company, Sylvania, which is not a defendant here. This action, begun in 1952, is the last of a series of litigations between Ledco and Westinghouse. It is the first in which General Electric has been involved.

Ledco went out of business at the end of December 1951, owing money to Westinghouse. Westinghouse shortly thereafter brought two successive actions against Ledco in the state court. The first was a replevin action to recover property of Westinghouse, i. e., lamps, in Ledco's possession. The second was an accounting action to recover moneys due Westinghouse. Each action eventually terminated in Westinghouse's favor after protracted litigation. In the accounting action Westinghouse recovered a judgment for $92,784.31 which was affirmed by the Appellate Division in 1961. The New York Court of Appeals denied leave to appeal. Westinghouse Electric Corp. v. Lyons, 13 App.Div.2d 738, 216 N.Y.S. 2d 655 (1st Dept.), application for leave to appeal denied, 10 N.Y.2d 707, 221 N.Y. S.2d 1027, 178 N.E.2d 191 (1961). West-

inghouse subsequently, after still another suit, obtained a partial satisfaction of this judgment primarily from a surety on Ledco's bond, but a substantial portion of it, i. e., $37,508.03, remains unpaid to this day.

In its answer in the accounting action, Ledco asserted as a defense that Westinghouse had violated the antitrust laws. At about the same time, Ledco began this action in this court, joining General Electric as a defendant with Westinghouse. The state court held in the accounting action that the antitrust claim was not proven. Westinghouse then asserted in this court, upon a motion for a stay, that the antitrust claims were res judicata, but the Court of Appeals disagreed, holding that the state court could not dispose of these claims with finality and that therefore they could still be litigated in this court. (Lyons v. Westinghouse Electric Corp., et al., 222 F.2d 184 (2d Cir. 1955)). The state court litigation having at last been concluded in 1961, the present action proceeded to trial toward the end of 1963.

I will first consider the case against General Electric, a latecomer to the Ledco-Westinghouse feud. At the risk of what may seem to be oversimplification, I will confine myself in this summary to the barest essentials. The history of the lamp business and of General Electric's control over it, a history which goes back to the closing decades of the 19th century, interesting as it is, need not be recounted in detail in order to understand the issues which are involved here. The agency system of selling lamps, which I shall discuss briefly hereinafter, has many ramifications and complications, most of which need not now be recited. Many of these details, as far as they are important, are set forth in the findings.

Prior to 1912, General Electric had acquired the basic patents pertaining to electric lamps. In 1912 General Electric licensed Westinghouse under those patents. By virtue of the license agreement, General Electric had the right to prescribe the prices, terms of sale and methods of sale to be observed by Westinghouse. Westinghouse was limited in the amount that it could sell to a certain "quota," expressed in terms of a percentage of the total sales of both companies. General Electric exercised its control through an official known as a "supervisor," who saw to it that Westinghouse complied with the agreement. The prices, terms of sale and method of sale of the two companies were identical.

General Electric marketed many of its lamps through agents, although it sold some directly to large consumers. The agents were of two principal kinds, which have come to be known as the "serving agent" and the "served agent." The serving agent corresponds to the wholesaler, in a seller-buyer relationship, and the served agent to a retailer. General Electric consigned its lamps to the serving agent who in turn consigned them to the served agent who sold them to the public. The served agent, after deducting his compensation, accounted for the proceeds of the sale to his supplier, the serving agent, who in turn, after deducting his compensation, accounted for them to General Electric.

Pursuant to the license agreement, Westinghouse had its own complex of serving and served agents doing business in the same way. The forms of contract between Westinghouse and its agents were subject to the approval of the General Electric supervisor and were identical with those employed by General Electric. General Electric would not permit one of its agents to act as an agent of Westinghouse.

In the early 1920's the United States Government attacked these arrangements under the antitrust laws. It attacked both the General Electric-Westinghouse license and the agency system itself. The attack was unsuccessful. The Supreme Court sustained both the agency system as such, when operated independently, and the General Electric-Westinghouse license which gave General Electric control over Westinghouse's lamp business. United States v. General Electric Company, 272 U.S. 476, 47 S.Ct. 192, 71

L.Ed. 362 (1926). The rationale of the decision, at least as far as the General Electric-Westinghouse license was concerned, was that the control exercised by General Electric was valid because General Electric owned the necessary patents and could therefore properly restrict Westinghouse in the use of those patents under the license.

In 1927 the basic patents were near to expiration. General Electric had other patents, many of them relating to lamps and lamp machinery, but it is not disputed that these patents were far less fundamental than the original ones upon which the 1912 license agreement was based. In 1927 General Electric and Westinghouse entered into a new agreement which superseded the 1912 agreement. It also licensed Westinghouse under the General Electric patents. It also limited Westinghouse's sales to a fixed percentage of the total sales of the two companies, and it also empowered General Electric to fix Westinghouse's prices, terms of sale and methods of sale. The supervision by the General Electric supervisor continued. In effect this contract required Westinghouse to continue the agency system.

In 1941 the Government renewed its attack on the licensing arrangements and the agency system by instituting an action for an injunction against General Electric, Westinghouse and other General Electric licensees, in the United States District Court for the District of New Jersey. Shortly after the action was begun Westinghouse accepted a consent decree which provided, however, that it would not become effective unless and until General Electric, who had decided to contest the suit, was enjoined. Trial of the case was postponed during the war. It was finally tried against General Electric and certain other defendants in 1946. The decision of the court (Forman, J.) was filed on January 19, 1949. United States v. General Electric Company, et al., 82 F.Supp. 753 (D.N.J.1949). The decree was finally entered in 1953 after a supplemental opinion on the form of relief. United States v. General Electric

Company, et al., 115 F.Supp. 835 (D. N.J.1953). No appeal was taken and the decree therefore became final.

Judge Forman decided that the General Electric-Westinghouse license was invalid and that General Electric had monopolized commerce in lamps, a monopoly to which Westinghouse, by virtue of the license agreement, was a party. In reaching this result, he held that General Electric's control over Westinghouse's lamp business could no longer be justified on the patent theory, because the patents licensed under the 1927 agreement were not.as significant as those which were licensed by the 1912 agreement which the Supreme Court had upheld in 1926. Judge Forman, however, refused to invalidate the agency system as such. He found that the system was essentially the same as that which was involved in the 1926 case, and that consequently, the government's attack upon it was precluded on principles of res judicata and stare decisis. He also found that the agency was a bona fide one, not a sham. He found that such deviations as had occurred in practice from the strict terms of the agency contracts were not significant enough to require the conclusion that the contracts, as the government claimed, were only devices for concealing what was in fact a seller-buyer relationship.

Some years before Judge Forman rendered his decision in 1949 invalidating the 1927 license agreement, Westinghouse had terminated that agreement, with General Electric's consent. The termination became effective on August 1, 1945. It will be observed that this event occurred early in the course of Ledco's agency with Westinghouse, over six years before Ledco went out of business.

■ Despite the years that have elapsed since August 1, 1945, several Westinghouse officials who participated in making the decision to terminate the license agreement, and who participated in the negotiations with General Electric leading to that termination, are still alive and testified at the trial. I believe

their testimony. I find as a fact that the termination was made in good faith, for sound business reasons, and that it was not, as plaintiffs assert, a mere pretense. I also find that upon the termination of the agreement all control by General Electric over the lamp business of Westinghouse, including the operations of the General Electric supervisor, came to an end. Indeed, all dealings in lamps between the two companies ceased, except that for a time, until Westinghouse could get them into production, General Electric sold to Westinghouse certain less popular types of lamps which General Electric manufactured. After August 1, 1945 each company conducted its own lamp business in competition with each other. Westinghouse's percentage of the total lamp market increased from 21.8 per cent in 1945 to 25.2 per cent in 1950. General Electric's share decreased from 57.4 per cent to 53.8 per cent for the respective years.

■ Each company put out its own price lists and terms of sale and forms of agency contracts. It is true that at the outset Westinghouse's price lists, terms of sale and contract forms were substantially identical with those which it had used prior to August 1, 1945 when they had been dictated by General Electric. As time went on, some differences developed. Westinghouse hit upon some new ideas for types of agencies and made various other changes in the procedures which it had previously followed. Despite these changes, I believe it fair to say that in the main, Westinghouse's procedures continued to be substantially the same as before, and substantially the same as General Electric's. The published price lists of the two companies continued to be the same. Any price competition between them took the form of differences in discounts from list prices rather than in the list prices themselves. By and large, Westinghouse's lamp business was "parallel" to General Electric's. But "conscious parallelism" is not, in and of itself, a violation of the antitrust laws. Theater Enterprises Inc. v. Paramount Film Distributing Corp.,

346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954).

■ The fundamental question, as far as this aspect of the case is concerned, is whether after August 1, 1945 there was any agreement or concert of action between General Electric and Westinghouse, any combination or conspiracy between them, to restrain or monopolize commerce in lamps. After considering all the evidence, I find that there was not. The evidence tending to show that each company acted independently of the other is sufficient to establish this fact and to outweigh any inferences which, in the absence of such evidence, might be drawn from the similarity in procedures which I have noted.

As to General Electric, plaintiffs' claim depends upon establishing that General Electric conspired or combined with Westinghouse, to plaintiffs' damage. Ledco was not a General Electric agent. It had no contract with General Electric. There is no basis for any claim against General Electric by virtue of any action taken by General Electric individually, apart from conspiracy. The fact, if it be a fact, that General Electric was unwilling to hire Ledco as a General Electric B agent, in the absence of any conspiracy between General Electric and Westinghouse, is immaterial. As to General Electric, plaintiffs must prove conspiracy or fail. I hold that plaintiffs have failed to prove the conspiracy which they allege, i. e., a conspiracy continuing after August 1, 1945 down through 1951. Although Judge Forman's decision, binding upon General Electric but not upon Westinghouse, is an adjudication that the General Electric-Westinghouse license agreement amounted to an illegal combination to monopolize, this agreement terminated on August 1, 1945. Plaintiffs do not claim that they sustained any damage up to that point or for years afterward. There is thus no causal connection between that illegal combination and plaintiffs' alleged damage, hence the existence of this combination up to August 1, 1945 is immaterial here. There is therefore no need to consider, as

far as General Electric is concerned, whether plaintiffs in fact suffered any damage. The action against General Electric will be dismissed.

Since General Electric did not conspire with Westinghouse after August 1, 1945, it necessarily follows that Westinghouse did not conspire with General Electric. But as to Westinghouse, there is more to plaintiffs' claim than the charge of conspiracy. Plaintiffs contend that Ledco's agency contract with Westinghouse was in itself a violation of the Sherman Act and Section 3 of the Clayton Act.

Plaintiffs' first position in this respect is that the relationship was not in fact one of agency at all, that the contract and all the elaborate paraphernalia of reports and accountings were spurious and sham, mere devices to cover up illegal control by Westinghouse as seller over Ledco as buyer, particularly over the prices to be charged by Ledco to its customers. The evidence offered to support this contention consists of the evidence of "deviations," i. e., evidence purporting to show that there were times when Westinghouse did not insist that Ledco abide by the strict letter of the contract.

This brings up a subject most exhaustively argued by Westinghouse, the "collateral estoppel" point. This stems from the decision of the state court in the accounting action. Westinghouse there sued Ledco to recover money which Ledco should have paid to Westinghouse for lamps, but which it had failed to pay or to report as owing. Ledco pleaded the defense of account stated, saying in substance that it had rendered periodic accounts to Westinghouse which Westinghouse had accepted without objection, and that consequently Westinghouse's claim was barred. The state court held that this defense was not made out because Ledco's accounts were false and fraudulent, and Westinghouse had no knowledge of their falsity when it accepted them. In fact, at the trial of the accounting action, Ledco admitted the fraud, a circumstance which, as the court pointed out, "cast a very severe and obvious pall

over" Ledco's position. The court said that "[i]t is well settled that a defrauded party with no knowledge of the facts is not bound simply by the acceptance of an account stated." It said further that the testimony of Westinghouse's district manager, Kinsey, "substantiates the absence of either scienter or acquiescence by" Westinghouse (Westinghouse Electric Corp. v. Lyons, 125 N.Y.S.2d 420, 422 (1953)).

Following what I understand to be the holding of the Court of Appeals in this case (Lyons v. Westinghouse Electric Corp., 222 F.2d 184 (2d Cir. 1955)), I ruled at pretrial that although the holding of the state court that Ledco had failed to establish its antitrust defense in the accounting action does not render plaintiffs' entire cause of action here res judicata, nevertheless "any specific factual matters determined in the State court between Westinghouse and plaintiffs, which were material to the issues there presented and which are material in this action would be conclusively determined for purposes of this action under principles of collateral estoppel." (Pre-Trial Order, p. 18)

The problem has been that inasmuch as the state court wrote only a brief opinion and made no formal findings of fact, it has been from the outset difficult to ascertain just what "specific factual matters" the state court did determine in this respect. At the trial I reserved decision on Westinghouse's objections based upon collateral estoppel, and admitted all the testimony that either party offered on the subject of Ledco's deviations from the contract and Westinghouse's knowledge of or acquiescence therein, subject to an eventual ruling.

There is abundant evidence here to show that Ledco's reports to Westinghouse over the years were false in a variety of ways. Indeed, plaintiffs do not contend otherwise. Sometimes Ledco reported more sales than it had in fact made. At other times it reported less.

The preponderance of the evidence shows that Westinghouse did not know

of the falsity of these reports in the earlier years. It is unreasonable to assume that if it had, it would have continued to do business with Ledco. By 1950 Westinghouse began to suspect that something was wrong, particularly with regard to Ledco's excessive claims for refund of excise taxes on lamps allegedly exported. By mid-1951 it had become apparent to Westinghouse that Ledco had deceived it, at least with regard to Ledco's unauthorized sales to discount houses. There followed a series of conversations between the parties which ended with Westinghouse taking the position that henceforth Ledco must abide by its contract, and with Ledco thereupon deciding to go out of business. Westinghouse acted with sufficient promptness after its discovery of Ledco's deception to correct the situation. No finding of acquiescence on Westinghouse's part in Ledco's fraud can be based upon Westinghouse's conduct in this respect.

█ In considering the question of collateral estoppel, it is necessary to distinguish between contract deviations which consist merely of false reporting by Ledco to Westinghouse, and deviations which do not necessarily involve false reporting. As to the first type, it is difficult to see how the fact that Ledco made false reports to Westinghouse and paid to Westinghouse less than it should have paid has any bearing upon the issue here under consideration. The fact that an agent is dishonest does not make him any the less an agent. Nor do I see that it is necessary for Westinghouse to invoke the doctrine of collateral estoppel to estop plaintiffs from denying what they do not deny in any event. Plaintiffs' own witnesses testified that the reports were often false. As far as the question of Westinghouse's knowledge of the falsity is concerned, the evidence before me is sufficient, in my opinion, to support a finding of lack of knowledge, regardless of what the state court determined on the evidence in the state court action. This kind of "deviation" therefore, i. e., mere dishonesty and

fraud, does not necessarily raise the question of collateral estoppel because (1) the fraud is not relevant to the issue of the bona fides of the agency, and (2) even if it were, there is no need to rely upon collateral estoppel in order to hold that the agency was bona fide despite the fraud.

The second type of so-called deviation in which Ledco engaged stands on a different footing. These deviations did not involve false reporting in the usual sense. One example is Ledco's practice of supplying lamps to discount houses such as Biddle. Ledco was not required to specify the names of its customers in its reports, hence its reports can hardly be said to be false because they failed to disclose something which Ledco was not called upon to disclose.

█ Such deviations might well be relevant to the issue of whether the relationship of the parties was in fact one of agency. Hence, as to these, the collateral estoppel argument must be faced. Did the state court determine that Westinghouse had no knowledge of such departures by Ledco from the terms of its authority? Although Westinghouse argues strenuously, largely upon the basis of briefs filed by Ledco on its various appeals in the state court, that the state court did so determine, I am not persuaded that this is so. It seems more probable, as far as one can tell from the state court's opinion, that the court concerned itself solely with matters of falsity in terms of dollars and cents. The issue in the state court was whether Westinghouse could recover money which Ledco had failed to report as due. In holding that it could, I doubt that the court purported to decide whether Westinghouse knew of Ledco's infractions of the rules in respects other than financial. Moreover, there again seems to be no need to invoke the doctrine of collateral estoppel, for the case has been fully tried de novo in this court and my finding can be based on the evidence here.

██ Under the circumstances, I will follow what seems to be the sounder

course. I will overrule Westinghouse's objection upon which I reserved decision and will receive all the evidence which I admitted. Having done so, I find on the evidence that Ledco broke its contract with Westinghouse, not only in failing to account properly for money, but in other respects as well. I also find that Westinghouse's responsible officials did not know this until 1951, and that when they learned of it, they promptly brought it to Ledco's attention and embarked upon the course which eventually ended in the termination of the relationship. Therefore, Ledco's improper behavior does not prove that the agency was sham.

A final word on this subject should be said concerning the testimony of certain other Westinghouse agents, testimony which they gave in the state court action and which was received here by stipulation as though it were a deposition in this case. The state court struck out this testimony, hence it seems clear that collateral estoppel cannot apply in this instance. The testimony tended to show that these agents also defrauded Westinghouse in various ways. I am not convinced that Westinghouse knew of their unfaithfulness, any more than it knew of Ledco's, in the first instance. When Westinghouse learned of it, it eventually sued these agents, just as it sued Ledco. Consequently, this testimony of other agents falls far short of proving plaintiffs' contention that the agency was sham.

My view of this deviation argument, to which so much time has been devoted by the parties, is substantially the same as Judge Forman's. He said of the same argument made by the Government in the case before him:

> "At most the Government has shown that on the lower echelons of the organization the rules were sometimes regarded as onerous and susceptible of causing loss of business, but the Government's documents are replete with evidence that in the higher and supervisory brackets all reasonable care was taken that the agency form should be strictly adhered to. The evidence is convincing that effort was extended and mechanics devised to enforce the provisions of the agency plan, that irregularities in it were not countenanced and where they occurred they were corrected." (United States v. General Electric Company, et al., 82 F.Supp. 753 at 824)

As one of Westinghouse's officials testified, apropos of Westinghouse's efforts to see that its contracts were carried out, "After all, the majority of our B agents were honest." The fact that a few of them, including these plaintiffs, were not, does not lead to the conclusion that the agency contracts were a mere device to conceal what was really a seller-buyer relationship. I hold on all the evidence that the contract between Westinghouse and Ledco constituted a bona fide contract of agency.

I come now to plaintiffs' final contention. They claim that even though the contract between Westinghouse and Ledco created a bona fide agency, nevertheless the contract violated the antitrust laws. In other words, they say that the principal may not legally set the price at which his agent sells.

At the time this case was tried, United States v. General Electric Company, supra, afforded a complete answer to this contention. But since this case was tried, the Supreme Court has decided Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). That case involved a system of distributing gasoline through consignment agreements. Defendant consigned its gasoline to gasoline station operators and set the price at which they could sell it. Plaintiff, such a consignee, sold gasoline at a price lower than that specified in the contract. Defendant thereupon terminated the consignment. Plaintiff then sued for treble damages for violations of Sections 1 and 2 of the Sherman Act. The District Court granted summary judgment in favor of defendant. The Court of Appeals affirmed. The Supreme Court reversed and remanded the case for further proceedings.

In considering the application of Union Oil to the present case, it seems clear at the outset that nothing turns on the fact that the agreement in Union Oil was called a consignment whereas here it is called an agency. In discussing United States v. General Electric Company, supra, the Court in Union Oil suggested no such distinction.

In the second place, although the Court in Union Oil put the word "consignment" in quotation marks, I do not understand that it held that the consignment was a sham, in the sense that plaintiffs have urged here. There is nothing in the opinion about any "deviations" from the contract provisions. I read the opinion as holding that a bona fide consignment or agency contract, when employed in a "vast gasoline distribution system," may not be used as a method of fixing the price at which the consignee or agent sells.

The dissenting Justices in Union Oil thought that the record made on a motion for summary judgment did not necessarily raise this question. They thought that there was no need to announce such a broad and novel principle. It may be that when the case has been tried and returns to the Supreme Court upon a full record, the Court may modify what it has said. Nevertheless, in deciding the case now before me, I must give heed to what the Court has thus far held in Union Oil.

Does Union Oil overrule United States v. General Electric, supra, at least for the future? Although the Court in Union Oil pointed out in a footnote (377 U.S. at 23, n. 10, 84 S.Ct. 1051) certain factual differences between the two cases, these seem comparatively minor, and I do not understand the Court to say that

it considered them sufficient to create any real distinction. The Court said plainly that the General Electric case would be limited to its special facts, and that the fact which was significant in General Electric was the existence of General Electric's patents. The Court said (377 U.S. at 24, 84 S.Ct. at 1058):

> "The patent laws which give a 17-year monopoly on 'making, using, or selling the invention' are *in pari materia* with the antitrust laws and modify them *pro tanto*. That was the *ratio decidendi* of the General Electric case. See 272 U.S., at 485, 47 S.Ct. 192, 71 L.Ed. 362. We decline the invitation to extend it." [1]

Whether this amounts to overruling General Electric or merely limiting it is a matter of semantics. The practical effect is the same, whichever word one uses. I cannot escape the conclusion that where no controlling patents are present, the rule laid down in General Electric, at least for the future, is no longer law.

If the new doctrine of Union Oil governs this case, it would seem to follow that the Westinghouse-Ledco agency contract violated the Sherman Act, for as we have seen, the patent situation in 1944–51 was distinctly different from what it was in 1926 when General Electric was decided.[2] If the presence or absence of controlling patents on the product makes the difference between legality and illegality, then this agreement would appear to be illegal, for it is clear that Westinghouse had no controlling patents on electric lamps in 1944–51, and if a principal who does not have a controlling patent on his product cannot legally tell his agent what to charge for it when the business in question is a "vast gasoline distribution system," the

---

1. Although I share Mr. Justice Stewart's doubts (377 U.S. 28–29, 84 S.Ct. 1051) as to whether the existence of patents actually was the *ratio decidendi* of the General Electric case, at least as far as the validity of the agency contracts in and of themselves was concerned, it is undeniable that the Court has now said that it was, and I am bound by that statement.

2. Whether it also violated Section 3 of the Clayton Act is more debatable. It would appear that it did not, as long as it was a true agency, for Section 3 does not apply to agents. The point was not involved in Union Oil. It seems unnecessary to decide it here.

same would seem to be true when the business is a vast system of distributing electric lamps.

The question remains, however, as to whether the Union Oil doctrine should be applied retroactively in this case to invalidate agreements which were legal when made and which were made in obvious reliance upon a decision of the Supreme Court which upheld, in favor of these very defendants, agreements substantially similar to the very agreements here involved. The Court in Union Oil expressly left open the question of retroactivity saying (377 U.S. at 24–25, 84 S.Ct. at 1058–1059):

> "We reserve the question whether, when all the facts are known, there may be any equities that would warrant only prospective application in damage suits of the rule governing price fixing by the 'consignment' device which we announce today."

The phrase "when all the facts are known" suggests that after further proceedings in the trial court, the Supreme Court may eventually decide that it will not apply the new doctrine to the Union Oil Company in that particular case, but will limit itself to announcing that the new rule will henceforth govern future cases. State courts have followed this approach, and when they do, their action does not violate the Constitution. Great Northern Railway Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932)

Whether the Court will ultimately take that position, however, is not of critical importance here, for even if the Supreme Court ultimately applies the new doctrine retroactively to the Union Oil Company in the particular case before it, it does not follow that the rule should be given a general retroactive effect in other cases. It seems clear that the Supreme Court has not yet decided whether or not it should, and that consequently, the lower federal courts have the obligation to reach their own conclusions on this question until such time as the Supreme Court decides it.

This subject of the retroactivity of overruling decisions is discussed at length in a Comment in the Yale Law Journal, "Prospective Overruling and Retroactive Application in the Federal Courts," 71 Yale L.J. 907 (April 1962). The cases up to the date of the article are fully discussed in it, and it seems unnecessary to expand this opinion by repeating much of that discussion here. None of the federal cases is precisely in point. The most nearly so are the municipal bond cases, of which Gelpcke v. City of Dubuque, 68 U.S. (1 Wall.) 175, 17 L.Ed. 520 (1864) is typical. In that case, the Supreme Court many years ago refused to apply retroactively a new doctrine of state law announced by a state court. which overruled the previous state doctrine, when to do so would have destroyed contractual rights acquired in reliance upon the earlier rule. The Supreme Court said that its decision "rests upon the plainest principles of justice. To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal." (68 U.S. 175, at 206). Although we are here concerned with an overruling decision of the Supreme Court itself, rather than of a state court, the principle which governed in Gelpcke would appear to be equally applicable here.

The Court of Appeals for the Second Circuit has recently refused to give general retroactive effect to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which overruled previous decisions that had held that the Constitution does not prohibit the admission in state criminal trials, pursuant to state law, of evidence obtained by illegal search.

United States v. Fay, 333 F.2d 12 (2d. Cir. 1964).

In so doing, the court laid down certain propositions which are apposite in the present case. In the first place, the court expressly rejected the Blackstonian theory that a court "discovers" law, and that the rule set forth in an overruling decision always was the law, which unfortunately the same court in the over-

ruled case had not properly discovered.[3] In the second place, the court said that it is "generally undesirable to give retroactive effect to overruling decisions, except under the most compelling circumstances." (333 F.2d 12 at 21). There are no such compelling circumstances here. On the contrary, the circumstances seem to me to compel the conclusion that the doctrine of Union Oil should not retroactively govern this case. If we are to look at the purpose of the Union Oil doctrine, that purpose would appear to be to prohibit price fixing by means of an agency or consignment contract, to the end that competition shall be free from this restraint. It could be said that it does not necessarily further the accomplishment of this purpose to impose a liability for treble damages upon one who made such a contract many years ago. The price fixing in such a case is of historical importance only. Its effect on competition is long since past. Competition in electric lamps in 1951 cannot be revived by awarding damages to these plaintiffs in 1964.

Be that as it may, it is the element of reliance by defendants upon the former rule that is to me most compelling. Here we have an agency system which was expressly upheld by the Supreme Court in General Electric and later by Judge Forman as well. There can be no doubt whatever that Westinghouse relied on these decisions in continuing that system in effect.

In the baseball case, Toolson v. New York Yankees, 346 U.S. 356, 74 S. Ct. 78, 98 L.Ed. 64 (1953), the Supreme Court declined to overrule its former decision in Federal Club of Baltimore v. National League of Professional Baseball Clubs, 259 U.S. 200, 42 S.Ct. 465, 66 L. Ed. 898 (1922), which had held that professional baseball does not constitute interstate commerce, because in the years that had intervened between the two cases, Congress had not seen fit to change

the rule of the earlier case and "[t]he business has thus been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation." (346 U.S. 356 at 357, 74 S.Ct. at 78–79). The same is true here. Westinghouse's business has been left for over thirty years to develop on the understanding that its agency system was not subject to existing antitrust legislation. Although in the present case, unlike the baseball case, the Supreme Court has not followed the principle of stare decisis, but rather has overruled its earlier decision in General Electric, at least the fact of reliance should prevent the retroactive application of the overruling doctrine. To hold Westinghouse liable now for damages for making and carrying out a contract which was perfectly legal at the time that it was made and carried out, would be manifestly unjust. It is hard to conceive of a case in which there could be stronger "equities" in defendants' favor. For these reasons I hold that the rule announced in Union Oil does not govern the Westinghouse agency contracts with which we are here concerned, and that for the purposes of this case, those contracts, under the rule of General Electric, do not contravene either the Sherman Act or the Clayton Act.

Finally, we come to the subject of plaintiffs' alleged damages. Apart from all other considerations, and even assuming, contrary to what has been said, that the Westinghouse-Ledco agency contract contravened the antitrust laws, nevertheless if plaintiffs have failed to prove that because of this illegal contract plaintiffs suffered damage, then they may not recover.

It may be noted that under Simpson v. Union Oil Company, supra, the fact that plaintiffs voluntarily entered into an illegal contract does not in itself bar their recovery. The contract, if illegal, is still an actionable wrong.

---

3. On this particular point, the court reached the same conclusion as it did in United States ex rel. Durocher v. La Vallee, 330 F.2d 303 (2d Cir. 1964), although in La Vallee, the court did give retroactive effect to the overruling decision in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

The Court said (377 U.S. at 16, 84 S.Ct. at 1054):

"The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws."

But it is still true that an actionable wrong may not give rise to damages, as the Court in Union Oil recognized by remanding the case for a determination, among other things, of "the damages, if any, suffered." (377 U.S. at 24, 84 S.Ct. 1051).

The essential facts on the damage issue are these:

Ledco's books were kept in such a way that it is impossible to make an accurate determination of what the profits or losses of the business were for any given period. Nevertheless it is clear that in the latter half of 1951, the business was in a highly unsound financial condition. Its liabilities exceeded its assets. Its loss for the period from May 1 to December 31, 1951, according to plaintiffs' own accountant, was $71,030.09. It owed to Westinghouse a sum eventually determined to be over $92,000. It owed to Sylvania $28,131.

During the latter part of 1951 plaintiff Joseph Lyons suffered a serious illness.

At the end of December plaintiffs decided to liquidate the business. This was plaintiffs' own decision. Westinghouse did not suggest it; on the contrary, it was surprised to learn of it. This decision followed by a few days a conference between Ledco representatives and Westinghouse officials in which Westinghouse advised Ledco that Westinghouse would not terminate Ledco's agency contract, which still had approximately six months to run, but that Westinghouse would insist that henceforth Ledco abide by the terms of that contract. Ledco did not object to this. The only act of Westinghouse of which plaintiffs complain is the statement made by a Westinghouse official at this conference to the effect that it was of no concern to Ledco whether or not Westinghouse enforced the contracts of other B agents.

Plaintiffs claim that Westinghouse forced Ledco to liquidate its business and that the liquidation caused damage to plaintiffs. There are several insurmountable weaknesses in this claim. In the first place, it is by no means definite that the liquidation of Ledco, whatever the reason for it, actually resulted in damage to plaintiffs. Whether Ledco would have made money if it had stayed in business is highly uncertain. How much it would have made, if it made anything, is wholly speculative. For all that plaintiffs' evidence shows, Ledco's liquidation may have benefitted plaintiffs rather than injured them, by putting an end to the losses that Ledco had theretofore sustained.

In the second place, even if we assume, despite the absence of evidence, that the liquidation did result in damage to plaintiffs, the evidence is far from persuasive that liquidation was necessary, whatever Westinghouse's attitude was. Ledco could have continued as the distributor for Sylvania, provided only that it paid Sylvania what it owed it. Ledco was unwilling to pay this debt, although it did not dispute that it was owing. If Ledco had cancelled its contract with Westinghouse and had continued solely as a distributor for Sylvania, who can say what the financial result would have been? Would Ledco have fared worse than it did when it distributed the lamps of both manufacturers? If so, how much worse? Here again, we are in the realm of pure speculation.

Finally, even if we assume both initial propositions in plaintiffs' favor, i. e., that (1) liquidation of Ledco did result in damage to plaintiffs, and (2) liquidation was necessary provided that relations between Ledco and Westinghouse were terminated, still plaintiffs have failed to show that they sustained damage as a result of any illegality inherent in the Westinghouse-Ledco contract. For this is not a case, as was Union Oil, in which the agent violated the price clause in the contract, thereby inducing the

principal to cancel it. Ledco did not object to the price clause. It was willing to agree to sell in the future at the price and on the terms prescribed by Westinghouse. Westinghouse did not cancel Ledco's contract. Plaintiffs contend that Ledco was forced out of business because Westinghouse would not agree to enforce the contract terms as against other agents. Plaintiffs say that Westinghouse discriminated against Ledco. They appear to say that plaintiffs could not afford to be honest and to abide by their contract unless Westinghouse compelled its other agents to be honest too.

Even if this claim were true, it would have no antitrust significance. There is no causal connection between the illegality of the contract and the alleged wrong. Since, according to plaintiffs, it was Westinghouse's discrimination, not the contract, which compelled Ledco to go out of business, it makes no difference whether the Westinghouse-Ledco contract was illegal or not.

 In any case, plaintiffs' claim is not substantiated by the evidence. I have already found that prior to December 1951 Westinghouse used its best efforts to enforce the contracts of all B agents. There is no reason to believe that it would not have continued to do so after December 1951. No such inference can properly be drawn from the statement of the Westinghouse official. A more natural inference is that this official, obviously annoyed by the revelations of Ledco's past breaches of its contract, felt that Ledco presumed unduly in seeking some guarantee from Westinghouse as to its policy with other agents, and believed that the only consideration relevant to the discussions was how Ledco itself proposed to behave henceforth. If Ledco actually believed, on the strength of this official's remark, that

Westinghouse intended to discriminate against it in this fashion, there was no reasonable basis for such a belief.[4] I doubt that Ledco actually believed it. In my opinion plaintiffs have seized upon this remark as a pretext for the subsequent liquidation of Ledco, a liquidation which plaintiffs decided upon for reasons of their own, either the insolvency of the business or Lyons' poor health, or both. Plaintiffs have sought to use this remark as a foundation upon which to construct a claim for damages. The foundation is not strong enough to support the claim. I find that Westinghouse did not force Ledco out of business. I conclude that plaintiffs have failed to prove that they sustained any damage whatever as a result of any act of Westinghouse and more particularly, that they have failed to prove that the Westinghouse-Ledco contract, even if it be assumed to have been illegal, caused them any damage.

 Plaintiffs also claim as an additional element of damage against Westinghouse the amount of the judgment which Westinghouse obtained against them in the state court, and the expenses, including attorneys' fees, incurred in defending the state court actions. This is on the theory that Westinghouse instituted these actions pursuant to a conspiracy to discredit plaintiffs. There is no merit to this claim. Westinghouse brought those actions to recover property and money due it, as it had a right to do. There is no evidence to indicate that it acted from any other motive, or that General Electric had anything to do with these actions. Plaintiffs are therefore not entitled to recover anything on this score.

In view of the conclusions which I have reached on the issues of liability and damages, there is no need to discuss de-

4. There is no substance to plaintiffs' theory that Westinghouse was antagonistic to Ledco because Ledco, as a Sylvania distributor, had submitted a certain bid to the State of New York. I believe the testimony of Westinghouse's witnesses as to this incident. I find that there was no connivance between Westinghouse and Sylvania or General Electric to prevent Ledco from bidding. I also find that this incident was not the reason which caused Westinghouse to insist that Ledco henceforth abide by its contract. The reason was Westinghouse's discovery of Ledco's previous breaches.

**540**

fendants' affirmative defenses of the statute of limitations.

The findings of fact and conclusions of law embodied in this opinion shall be deemed to supplement those contained in the formal findings.

The Clerk is directed to enter judgment in favor of both defendants dismissing the action.

So ordered.