381 U.S. 618 (1965)
LINKLETTER
v.
WALKER, WARDEN.
No. 95.
Supreme Court of United States.
Argued March 11, 1965.
Decided June 7, 1965.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.
*619 Euel A. Screws, Jr., argued the cause for petitioner. With him on the brief was Truman Hobbs.
Teddy W. Airhart, Jr., Assistant Attorney General of Louisiana, argued the cause for respondent. With him on the brief was Jack P. F. Gremillion, Attorney General.
H. Richard Uviller argued the cause for the National District Attorneys' Association, as amicus curiae, urging affirmance. With him on the brief was Michael Juviler. Louis J. Lefkowitz, Attorney General of New York, Samuel A. Hirshowitz, First Assistant Attorney General, Barry Mahoney and Thomas F. O'Hare, Jr., Assistant Attorneys General, H. Richard Uviller and Michael Juviler filed a supplementary memorandum on behalf of the National District Attorneys' Association, as amicus curiae.
MR. JUSTICE CLARK delivered the opinion of the Court.
In Mapp v. Ohio, 367 U. S. 643 (1961), we held that the exclusion of evidence seized in violation of the search and seizure provisions of the Fourth Amendment was required of the States by the Due Process Clause of the Fourteenth Amendment. In so doing we overruled Wolf v. Colorado, 338 U. S. 25 (1949), to the extent that it failed to apply the exclusionary rule to the States.[1] This case presents the question of whether this requirement operates retrospectively upon cases finally decided in the *620 period prior to Mapp. The Court of Appeals for the Fifth Circuit held that it did not, 323 F. 2d 11, and we granted certiorari in order to settle what has become a most troublesome question in the administration of justice.[2] 377 U. S. 930. We agree with the Court of Appeals.
*621 The petitioner was convicted in a Louisiana District Court on May 28, 1959, of "simple burglary." At the time of his arrest he had been under surveillance for two days as a suspect in connection with another burglary. He was taken to the police station, searched, and keys were taken from his person. After he was booked and placed in jail, other officers took his keys, entered and searched his home, and seized certain property and papers. Later his place of business was entered and searched and seizures were effected. These intrusions were made without a warrant. The State District Court held that the arresting officers had reasonable cause for the arrest under Louisiana law and finding probable cause to search as an incident to arrest it held the seizures valid. The Supreme Court of Louisiana affirmed in February 1960.
On June 19, 1961, Mapp was announced. Immediately thereafter petitioner filed an application for habeas corpus in the state court on the basis of Mapp. The writ being denied in the Louisiana courts, he then filed a like application in the United States District Court. After denial there he appealed and the Court of Appeals affirmed. It found the searches too remote from the arrest and therefore illegal but held that the constitutional requirement of exclusion of the evidence under Mapp was not retrospective. Petitioner has two points: (1) that the Court of Appeals erred in holding that Mapp was not retrospective; and (2) that even though Mapp be held not to operate retrospectively, the search in his case was subsequent to that in Mapp, and while his final conviction was long prior to our disposition of it, his case should nevertheless be governed by Mapp.
Initially we must consider the term "retrospective" for the purposes of our opinion. A ruling which is purely prospective does not apply even to the parties before the *622 court.[3] See, e. g., England v. Louisiana State Board of Medical Examiners, 375 U. S. 411 (1964). See also Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358 (1932). However, we are not here concerned with pure prospectively since we applied the rule announced in Mapp to reverse Miss Mapp's conviction. That decision has also been applied to cases still pending on direct review at the time it was rendered.[4] Therefore, in this case, we are concerned only with whether the exclusionary principle enunciated in Mapp applies to state court convictions which had become final[5] before rendition of our opinion.

I.
While to some it may seem "academic" it might be helpful to others for us to briefly outline the history and theory of the problem presented.
At common law there was no authority for the proposition that judicial decisions made law only for the future.[6] Blackstone stated the rule that the duty of the court was not to "pronounce a new law, but to maintain and expound *623 the old one." 1 Blackstone, Commentaries 69 (15th ed. 1809).[7] This Court followed that rule in Norton v. Shelby County, 118 U. S. 425 (1886),[8] holding that unconstitutional action "confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." At 442. The judge rather than being the creator of the law was but its discoverer. Gray, Nature and Sources of the Law 222 (1st ed. 1909). In the case of the overruled decision, Wolf v. Colorado, supra, here, it was thought to be only a failure at true discovery and was consequently never the law; while the overruling one. Mapp, was not "new law but an application of what is, and therefore had been, the true law." Shulman, Retroactive Legislation, 13 Encyclopedia of the Social Sciences 355, 356 (1934).
On the other hand, Austin maintained that judges do in fact do something more than discover law: they make *624 it interstitially by filling in with judicial interpretation the vague, indefinite, or generic statutory or common-law terms that alone are but the empty crevices of the law. Implicit in such an approach is the admission when a case is overruled that the earlier decision was wrongly decided. However, rather than being erased by the later overruling decision it is considered as an existing juridical fact until overruled, and intermediate cases finally decided under it are not to be disturbed.
The Blackstonian view ruled English jurisprudence and cast its shadow over our own as evidenced by Norton v. Shelby County, supra. However, some legal philosophers continued to insist that such a rule was out of tune with actuality largely because judicial repeal of time did "work hardship to those who [had] trusted to its existence." Cardozo, Address to the N. Y. Bar Assn., 55 Rep. N. Y. State Bar Assn. 263, 296-297 (1932). The Austinian view gained some acceptance over a hundred years ago when it was decided that although legislative divorces were illegal and void, those previously granted were immunized by a prospective application of the rule of the case. Bingham v. Miller, 17 Ohio 445 (1848). And as early as 1863 this Court drew on the same concept in Gelpcke v. Dubuque, 1 Wall. 175 (1863). The Supreme Court of Iowa had repeatedly held that the Iowa Legislature had the power to authorize municipalities to issue bonds to aid in the construction of railroads. After the City of Dubuque had issued such bonds, the Iowa Supreme Court reversed itself and held that the legislature lacked such power. In Gelpcke, which arose after the overruling decision, this Court held that the bonds issued under the apparent authority granted by the legislature were collectible. "However we may regard the late [overruling] case in Iowa as affecting the future, it can have no effect upon the past." At 206. The theory was, as Mr. Justice Holmes stated in Kuhn v. Fairmont Coal Co., 215 U. S. *625 349, 371 (1910), "that a change of judicial decision after a contract has been made on the faith of an earlier one the other way is a change of the law." And in 1932 Mr. Justice Cardozo in Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358, applied the Austinian approach in denying a federal constitutional due process attack on the prospective application of a decision of the Montana Supreme Court. He said that a State "may make a choice for itself between the principle of forward operation and that of relation backward." At 364. Mr. Justice Cardozo based the rule on the avoidance of "injustice or hardship" citing a long list of state and federal cases supporting the principle that the courts had the power to say that decisions though later overruled "are law none the less for intermediate transactions." At 364. Eight years later Chief Justice Hughes in Chicot County Drainage Dist. v. Baxter State Bank, 308 U. S. 371 (1940), in discussing the problem made it clear that the board statements of Norton,supra, "must be taken with qualifications." He reasoned that the actual existence of the law prior to the determination of unconstitutionality "is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration." He laid down the rule that the "effect of the subsequent ruling as to invalidity may have to be considered in various aspects." At 374.
One form of limited retraction which differs somewhat from the type discussed above is that which was established in United States v. Schooner Peggy, 1 Cranch 103 (1801). There, a schooner had been seized under an order of the President which commanded that any armed French vessel found on the high seas be captured. An order of condemnation was entered on September 23, 1800. However, while the case was pending before this Court the United States signed an agreement with France providing that any property captured and not "definitively *626 condemned" should be restored. Chief Justice Marshall said:
"It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied . . . [and] where individual rights . . . are sacrificed for national purposes. . . the court must decide according to existing laws, and if it be necessary to set aside a judgment. . . which cannot be affirmed but in violation of law, the judgment must be set aside." At 110.
This same approach was subsequently applied in instances where a statutory change intervened, Carpenter v. Wabash R. Co., 309 U. S. 23 (1940); where a constitutional amendment was adopted, United States v. Chambers, 291 U. S. 217 (1934);[9] and where judicial decision altered or overruled earlier case law, Vandenbark v. Owens-Illinois Glass Co., 311 U. S. 538 (1941).[10]
*627 Under our cases it appears (1) that a change in law will be given effect while a case is on direct review, Schooner Peggy, supra,[11] and (2) that the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked is subject to no set "principle of absolute retroactive invalidity" but depends upon a consideration of "particular relations . . . and particular conduct . . . of rights claimed to have become vested, of status, of prior determinations deemed to have finality"; and "of public policy in the light of the nature both of the statute and of its previous application." Chicot County Drainage Dist. v. Baxter State Bank, supra, at 374.
That no distinction was drawn between civil and criminal litigation is shown by the language used not only in Schooner Peggy, supra, and Chicot County, supra, but also in such cases as State v. Jones, 44 N. M. 623, 107 P. 2d 324 (1940) and James v. United States, 366 U. S. 213 (1961). In the latter case, this Court laid down a prospective principle in overruling Commissioner v. Wilcox, 327 U. S. 404 (1946), "in a manner that will not prejudice those who might have relied on it."[12] At 221. *628 Thus, the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective. And "there is much to be said in favor of such a rule for cases arising in the future." Mosser v. Darrow, 341 U. S. 267, at 276 (dissenting opinion of BLACK, J.).
While the cases discussed above deal with the invalidity of statutes or the effect of a decision overturning long-established common-law rules, there seems to be no impediment constitutional or philosophicalto the use of the same rule in the constitutional area where the exigencies of the situation require such an application. It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule.[13] Petitioner contends that our *629 method of resolving those prior cases demonstrates that an absolute rule of retroaction prevails in the area of constitutional adjudication. However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, "We think the federal constitution has no voice upon the subject."[14]
Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. We believe that this approach is particularly correct with reference to the Fourth Amendment's prohibitions as to unreasonable searches and seizures. Rather than "disparaging" the Amendment we but apply the wisdom of Justice Holmes that "[t]he life of the law has not been logic: it has been experience." Holmes, The Common Law 5 (Howe ed. 1963).[15]

II.
Since Weeks v. United States, 232 U. S. 383 (1914), this Court has adhered to the rule that evidence seized by federal officers in violation of the Fourth Amendment *630 is not admissible at trial in a federal court. In 1949 in Wolf v. Colorado, supra, the Court decided that while the right to privacy"the core of the Fourth Amendment"was such a basic right as to be implicit in "the concept of ordered liberty" and thus enforceable against the States through the Fourteenth Amendment, "the ways of enforcing such a basic right raise questions of a different order. How such arbitrary conduct should be checked, what remedies against it should be afforded, the means by which the right should be made effective, are all questions that are not to be so dogmatically answered as to preclude the varying solutions which spring from an allowable range of judgment on issues not susceptible of quantitative solution." At 27-28.
The Court went on to say that the federal exclusionary rule was not "derived from the explicit requirements of the Fourth Amendment . . . . The decision was a matter of judicial implication." At 28. Since "we find that in fact most of the English-speaking world does not regard as vital to such protection the exclusion of evidence thus obtained, we must hesitate to treat this remedy as an essential ingredient of the right."[16] At 29. While granting that "in practice" the exclusion of evidence might be "an effective way of deterring unreasonable searches," the Court concluded that it could not "condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective." At 31. The continuance of the federal exclusionary rule was excused on the ground that the reasons for it were more *631 "compelling" since public opinion in the community could be exerted against oppressive conduct by local police far more effectively than it could throughout the country.
The "asymmetry which Wolf imported into the law," Mapp v. Ohio, supra, at 670 (concurring opinion of DOUGLAS, J.), was indicated by a decision announced on the same day, Lustig v. United States, 338 U. S. 74 (1949), holding that evidence given to federal authorities "on a silver platter" by state officers was not excludable in federal trials. At 79. Wolf's holding, in conjunction with the "silver platter" doctrine of Lustig, provided wide avenues of abuse in the Weeks' exclusionary rule in the federal courts. Evidence seized in violation of the Fourth Amendment by state officers was turned over to federal officers and admitted in evidence in prosecutions in the federal courts. In 1951 Wolf was strengthened by Stefanelli v. Minard, 342 U. S. 117, in which the Court refused to permit a federal court to enjoin the use of evidence in a state criminal proceeding that had been illegally seized by state officers. In 1952, however, the Court could not tolerate the procedure involved in Rochin v. California, 342 U. S. 165, where morphine capsules pumped from the accused's stomach by state officers were admitted in evidence in a state court. It struck down the conviction on due process grounds under the Fourteenth Amendment because the action was shocking to the conscience. In 1954 came Irvine v. California, 347 U. S. 128, in which the State admitted evidence procured via a microphone secreted clandestinely by state police in the accused's bedroom. These "incredible" circumstances did not sufficiently shock the conscience of the Court into applying the Rochin test. Instead the case went off on the doctrine of Wolf. Mr. Justice Jackson in announcing the judgment of the Court overruled those who urged that Wolf "applies only to searches and seizures which produce on our minds *632 a mild shock, while if the shock is more serious, the states must exclude the evidence or we will reverse the conviction." At 133-134. He strongly reaffirmed Wolf stating:
"Now that the Wolf doctrine is known to them, state courts may wish further to reconsider their evidentiary rules. But to upset state convictions even before the states have had adequate opportunity to adopt or reject the rule would be an unwarranted use of federal power." At 134.
The opinion in dealing with the operation of the exclusionary rule said that it "must be remembered that petitioner is not invoking the Constitution to prevent or punish a violation of his federal right recognized in Wolf . . . . He is invoking it only to set aside his own conviction of crime. . . . Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. . . . [It] does nothing to protect innocent persons who are the victims of illegal but fruitless searches." At 136. Admitting the futility of other remedies available to the victims of illegal searches, Mr. Justice Jackson and the then Chief Justice suggested that the "Clerk of this Court should be directed to forward a copy of the record in this case, together with a copy of this opinion, for attention of the Attorney General of the United States" with a view to prosecution under the Civil Rights Act, 62 Stat. 696, 18 U. S. C. § 242 (1958 ed.). In concurring in the judgment in Irvine the writer of this opinion indicated his displeasure with Wolf but observed that since the Court "still refuses today" to overrule it he felt bound by Wolf but had hopes that "strict adherence to the tenor of that decision may produce needed converts for its extinction." At 138-139. The Court continued to broaden the rule of exclusion when, in 1956, it held that a federal agent might be enjoined from transferring to state authorities evidence that he *633 had seized on an illegal federal warrant, or testifying with regard to it in a state prosecution. Rea v. United States, 350 U. S. 214. In 1960 the Court's dissatisfaction with the "silver platter" doctrine, Lustig v. United States, supra, led to its rejection in the leading case of Elkins v. United States, 364 U. S. 206. The factual situation being the converse of Rea v. United States, supra, the Court tightened the noose of exclusion in order to strangle completely the use in the federal courts of evidence illegally seized by state agents. It was in Elkins that the Court emphasized that the exclusionary rule was "calculated to prevent, not to repair. Its purpose is to deterto compel respect for the constitutional guaranty in the only effectively available wayby removing the incentive to disregard it."[17] At 217.
Mapp was announced in 1961. The Court in considering "the current validity of the factual grounds upon which Wolf was based" pointed out that prior to Wolf "almost two-thirds of the States were opposed to the use of the exclusionary rule, now, despite the Wolf case, more than half of those since passing upon it . . . have wholly or partly adopted or adhered to the Weeks rule." At 651. We then cited California as typical of those adopting the rule since Wolf. It was " `compelled to reach that conclusion.' " we said, quoting California's highest court, " `because other remedies have completely failed to secure compliance with the constitutional provisions. . . .' People v. Cahan, 44 Cal. 2d 434 . . . " We went on to find that "[t]he experience of California that such other remedies have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been recognized *634 by this Court since Wolf. See Irvine v. California. . . ." At 652-653. In discussing People v. Defore, 242 N. Y. 13, 150 N. E. 585, upon which Wolf heavily relied, we concluded that "Likewise, time has set its face against what Wolf called the `weighty testimony' of People v. Defore . . . `that [t]he Federal rule as it stands is either too strict or too lax.' 242 N. Y., at 22." At 653. We concluded that "the force of that reasoning has been largely vitiated by later decisions of this Court," at 653. which had closed all of the courtroom doors "open to evidence secured by official lawlessness . . ." save that of the state courts. At 655. That door was closed by Mapp.
In recapitulation, we found in Mapp that Wolf rested on these grounds. First, that the "contrariety of views of the States" as to the use of the exclusionary rule was "particularly impressive." Second, " `other means of protection' [of Fourth Amendment rights] ha[d] been afforded" than the exclusionary rule. And, third, the "weighty testimony" of People v. Defore, supra. As to the first, we found the lineup of the States as to the exclusionary rule had shifted to where a majority favored it; as to the second, that the other means of protection had proven to be "worthless and futile" and had not reduced the incidence of police lawlessness during the 12 years since Wolf was announced but that Wolf had operated as a license for police illegality; and, as to the third, that our cases subsequent to Mapp had completely closed the laxity in the federal exclusionary rule complained of in People v. Defore, supra. We also affirmatively found that the exclusionary rule was "an essential part of both the Fourth and Fourteenth Amendments" and the only effective remedy for the protection of rights under the Fourth Amendment; that it would stop the needless "shopping around" that was causing conflict between federal and state courts, as was permitted in Wilson v. Schnettler, 365 U. S. 381 (1961); that it would withdraw the invitation *635 which Wolf extended to federal officers to step across the street to the state's attorney with their illegal evidence, thus eliminating a practice which tended to destroy the entire system of constitutional restraints on which the liberties of the people rest; that it would promote state-federal cooperation in law enforcement by rejecting the double standard of admissibility of illegal evidence which tends to breed suspicion among the officers, encourages disobedience to the Constitution on the part of all the participants and violates "the imperative of judicial integrity." Mapp v. Ohio, supra, at 657-660. In short, just as other cases had found the exclusionary rule to be a deterrent safeguard necessary to the enforcement of the Amendment, Silverthorne Lumber Co. v. United States, 251 U. S. 385 (1920), Mapp bottomed its rule on its necessity as a "sanction upon which [the Fourth Amendment's] protection and enjoyment had always been deemed dependent under the Boyd, Weeks and Silverthorne cases." At 655. Mapp's rationale was that since Wolf we had on an ad hoc basis been led to exclude all evidence in both state and federal courts where a federal agent had participated in the illegal search. Only a few States had made any changes in their rule of admissibility since Wolf and many of those not following the federal exclusionary rule were, in effect, using Wolf as a license to violate the Fourth Amendment's proscription of unreasonable searches and seizures as applied to the States by the Wolf case itself. As we noted in Mapp "further delay in [applying the exclusionary rule to the States] could have no effect other than to compound the difficulties"; a definitive continuance of Wolf might have increased the number of cases involving illegal searches in non-exclusionary States and also enticed those in the exclusionary column to reverse their position, as some States had done prior to Mapp.

*636 III.
We believe that the existence of the Wolf doctrine prior to Mapp is "an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration." Chicot County Drainage Dist. v. Baxter State Bank, supra, at 374. The thousands of cases that were finally decided on Wolf cannot be obliterated. The "particular conduct, private and official," must be considered. Here "prior determinations deemed to have finality and acted upon accordingly" have "become vested." And finally, "public policy in the light of the nature both of the . . . [Wolf doctrine] and of its previous application" must be given its proper weight. Ibid. In short, we must look to the purpose of the Mapp rule; the reliance placed upon the Wolf doctrine; and the effect on the administration of justice of a retrospective application of Mapp.
It is clear that the Wolf Court, once it had found the Fourth Amendment's unreasonable Search and Seizure Clause applicable to the States through the Due Process Clause of the Fourteenth Amendment, turned its attention to whether the exclusionary rule was included within the command of the Fourth Amendment. This was decided in the negative. It is clear that based upon the factual considerations heretofore discussed the Wolf Court then concluded that it was not necessary to the enforcement of the Fourth Amendment for the exclusionary rule to be extended to the States as a requirement of due process. Mapp had as its prime purpose the enforcement of the Fourth Amendment through the inclusion of the exclusionary rule within its rights. This, it was found, was the only effective deterrent to lawless police action. Indeed, all of the cases since Wolf requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police *637 action. See, e. g., Rea v. United States, supra. We cannot say that this purpose would be advanced by making the rule retrospective. The misconduct of the police prior to Mapp has already occurred and will not be corrected by releasing the prisoners involved. Nor would it add harmony to the delicate state-federal relationship of which we have spoken as part and parcel of the purpose of Mapp. Finally, the ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.
It is true that both the accused and the States relied upon Wolf. Indeed, Wolf and Irvine each pointed the way for the victims of illegal searches to seek reparation for the violation of their privacy. Some pursued the same. See Monroe v. Pape, 365 U. S. 167 (1961). In addition, in Irvine, a flag in a concurring opinion warned that Wolf was in stormy weather. On the other hand, the States relied on Wolf and followed its command. Final judgments of conviction were entered prior to Mapp. Again and again this Court refused to reconsider Wolf and gave its implicit approval to hundreds of cases in their application of its rule. In rejecting the Wolf doctrine as to the exclusionary rule the purpose was to deter the lawless action of the police and to effectively enforce the Fourth Amendment. That purpose will not at this late date be served by the wholesale release of the guilty victims.
Finally, there are interests in the administration of justice and the integrity of the judicial process to consider. To make the rule of Mapp retrospective would tax the administration of justice to the utmost. Hearings would have to be held on the excludability of evidence long since destroyed, misplaced or deteriorated. If it is excluded, the witnesses available at the time of the original trial will not be available or if located their memory will be dimmed. To thus legitimate such an extraordinary *638 procedural weapon that has no bearing on guilt would seriously disrupt the administration of justice.
It is urged, however, that these same considerations apply in the cases that we have applied retrospectively in other areas,[18] notably that of coerced confessions, and that the Mapp exclusionary rule should, therefore, be given the same dignity and effect. Two cases are cited, Fay v. Noia, 372 U. S. 391 (1963), and Reck v. Pate, 367 U. S. 433 (1961), but neither is apposite. It is said that we ordered new trials 25 years after conviction in the latter and after the lapse of 21 years in the former. This time table is true but that is all. The principle that a coerced confession is not admissible in a trial predated the arrests as well as the original convictions in each of these cases. See Brown v. Mississippi, 297 U. S. 278 (1936). There was no question of retrospective operation involved in either case. Moreover, coerced confessions are excluded from evidence because of "a complex of values," Blackburn v. Alabama, 361 U. S. 199 (1960), including "the likelihood that the confession is untrue"; "the preservation of the individual's freedom of will"; and " `[t]he abhorrence of society to the use of involuntary confessions.' " At 207. Cited with approval in Jackson v. Denno, 378 U. S. 368, 385-386 (1964). But there is no likelihood of unreliability or coercion present in a search-and-seizure case. Rather than being abhorrent at the time of seizure in this case, the use in state trials of illegally seized evidence had been specifically authorized by this Court in Wolf.[19] Furthermore, in Noia, the confession was admittedly coerced and the sole issue involved the availability of federal habeas corpus in a state conviction, *639 where state post-conviction remedies had been exhausted but the accused had failed to appeal from his original conviction. Nothing of that kind is involved here and this holding has no bearing whatever on Noia or Reck, for that matter. Finally, in each of the three areas in which we have applied our rule retrospectively[20] the principle that we applied went to the fairness of the trialthe very integrity of the fact-finding process. Here, as we have pointed out, the fairness of the trial is not under attack. All that petitioner attacks is the admissibility of evidence, the reliability and relevancy of which is not questioned, and which may well have had no effect on the outcome.
Nor can we accept the contention of petitioner that the Mapp rule should date from the day of the seizure there, rather than that of the judgment of this Court. The date of the seizure in Mapp has no legal significance. It was the judgment of this Court that changed the rule and the date of that opinion is the crucial date. In the light of the cases of this Court this is the better cutoff time. See United States v. Schooner Peggy, supra.
All that we decide today is that though the error complained of might be fundamental it is not of the nature *640 requiring us to overturn all final convictions based upon it. After full consideration of all the factors we are not able to say that the Mapp rule requires retrospective application.
Affirmed.
MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.
The Court of Appeals held, and this Court now concedes, that the petitioner Linkletter is presently in prison serving a nine-year sentence at hard labor for burglary under a 1959 Louisiana State Court conviction obtained by use of evidence unreasonably seized in violation of the Fourth and Fourteenth Amendments. On June 19, 1961, we decided Mapp v. Ohio, 367 U. S. 643, in which the Court specifically held that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." 367 U. S., at 655. Stating that this Court had previously held in Wolf v. Colorado, 338 U. S. 25, that the Fourth Amendment was applicable to the States through the Due Process Clause of the Fourteenth Amendment, this Court in Mapp went on to add:
"In short, the admission of the new constitutional right by Wolf could not consistently tolerate denial of its most important constitutional privilege, namely, the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment." 367 U. S., at 656.
Despite the Court's resounding promises throughout the Mapp opinion that convictions based on such "unconstitutional evidence" would " `find no sanction in the judgments *641 of the courts,' " Linkletter, convicted in the state court by use of "unconstitutional evidence," is today denied relief by the judgment of this Court because his conviction became "final" before Mapp was decided. Linkletter must stay in jail; Miss Mapp, whose offense was committed before Linkletter's, is free. This different treatment of Miss Mapp and Linkletter points up at once the arbitrary and discriminatory nature of the judicial contrivance utilized here to break the promise of Mapp by keeping all people in jail who are unfortunate enough to have had their unconstitutional convictions affirmed before June 19, 1961.
Miss Mapp's Ohio offense was committed May 23, 1957; Linkletter's Louisiana offense occurred more than a year laterAugust 16, 1958. Linkletter was tried in Louisiana, convicted, the State Supreme Court affirmed, and a rehearing was denied March 21, 1960, all within about one year and seven months after his offense was committed. The Ohio Supreme Court affirmed Miss Mapp's conviction March 23, 1960, approximately two years and 10 months after her offense. Thus, had the Ohio courts proceeded with the same expedition as those in Louisiana, or had the Louisiana courts proceeded as slowly as the Ohio courts, Linkletter's conviction would not have been "finally" decided within the Court's definition of "finally" until within about 10 days of the time Miss Mapp's case was decided in this Courtwhich would have given Linkletter ample time to petition this Court for virtually automatic relief on direct review after the Mapp case was decided. The Court offers no defense based on any known principle of justice for discriminating among defendants who were similarly convicted by use of evidence unconstitutionally seized. It certainly cannot do so as between Linkletter and Miss Mapp. The crime with which she was charged took *642 place more than a year before his, yet the decision today seems to rest on the fanciful concept that the Fourth Amendment protected her 1957 offense against conviction by use of unconstitutional evidence but denied its protection to Linkletter for his 1958 offense. In making this ruling the Court assumes for itself the virtue of acting in harmony with a comment of Justice Holmes that "[t]he life of the law has not been logic: it has been experience."[1] Justice Holmes was not there talking about the Constitution; he was talking about the evolving judge-made law of England and of some of our States whose judges are allowed to follow in the common law tradition. It should be remembered in this connection that no member of this Court has ever more seriously criticized it than did Justice Holmes for reading its own predilections into the "vague contours" of the Due Process Clause.[2] But quite apart from that, there is no experience of the past that justifies a new Court-made rule to perpetrate a grossly invidious and unfair discrimination against Linkletter simply because he happened to be prosecuted in a State that was evidently well up with its criminal court docket. If this discrimination can be excused at all it is not because of experience but because of logicsterile and formal at thatnot, according to Justice Holmes, the most dependable guide in lawmaking.
When we get beyond the way the new rule works as between people situated like Linkletter and Miss Mapp, the new contrivance stands no better. I say "new" because the Court admits, as it must, that "It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule." Ante, p. 628. And the Court also refers to *643 a number of cases in which that practice has been followed. For example, in Griffin v. Illinois, 351 U. S. 12, where we announced that a pauper could not be denied the right to appeal because of his indigency, a suggestion was made in a concurring opinion that the Court should apply its new rule to future cases only. Id., at 25-26. However, in 1958 this Court did apply the Griffin rule to a conviction obtained in 1935, over the dissents of two Justices who said that the Griffin case decided in 1956 should not determine the constitutionality of the petitioner's 1935 conviction. Eskridge v. Washington, 357 U. S. 214.
Interesting as the question may be abstractly, this case should not be decided on the basis of arguments about whether judges "make" law or "discover" it when performing their duty of interpreting the Constitution. This Court recognized in Chicot County Drainage District v. Baxter State Bank, 308 U. S. 371, 374, an opinion in which I joined, that "an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." And where state courts in certain situations chose to apply their decisions to the future only, this Court also said that, "the federal constitution has no voice" forbidding them to do so. Great Northern R. Co. v. Sunburst Oil & Ref. Co., 287 U. S. 358, 364. But cf. Kuhn v. Fairmont Coal Co., 215 U. S. 349, 372 (dissenting opinion). In stating this Court's position on the question, the opinion in the Chicot County case recognized that rights and interests may have resulted from the existence and operation of a statute which should be respected notwithstanding its later being declared unconstitutional:
"The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,with respect to particular relations, individual *644 and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination." 308 U. S., at 374.
Thus in Mosser v. Darrow, 341 U. S. 267, when this Court created an entirely new rule imposing heavy financial liability on a trustee in bankruptcy for acts which at the time he performed them had been perfectly valid under the law, I dissented, stating my belief that although there was "much to be said in favor of such a rule [of trustee liability] for cases arising in the future," 341 U. S., at 276, it should not be applied against trustees who had in good faith relied on the existence of a different rule in the past. On the other hand, in James v. United States, 366 U. S. 213, I suggested in an opinion in which MR. JUSTICE DOUGLAS joined, that there were objections having a peculiar force in the field of criminal law to a judicial rule to the effect that courts "should make their decisions as to what the law is apply only prospectively." A major basis for what we said there was stated this way:
"Our trouble with this aspect of the Court's action is that it seems to us to indicate that the Court has passed beyond the interpretation of the tax statute and proceeded substantially to amend it.
.....
"In our judgment one of the great inherent restraints upon this Court's departure from the field of interpretation to enter that of lawmaking has been the fact that its judgments could not be limited to prospective application." 366 U. S., at 224-225.
I adhere to my views in James, expressing opposition to a general rule that would always apply new interpretations *645 of criminal laws prospectively. Doubtless there might be circumstances in which applying a new interpretation of the law to past events might lead to unjust consequences which, as we said in Chicot, "cannot justly be ignored." No such unjust consequences to Linkletter, however, can possibly result here by giving him and others like him the benefit of a changed constitutional interpretation where he is languishing in jail on the basis of evidence concededly used unconstitutionally to convict him. And I simply cannot believe that the State of Louisiana has any "vested interest" that we should recognize in these circumstances in order to keep Linkletter in jail. I therefore would follow this Court's usual practice and apply the Mapp rule to unconstitutional convictions which have resulted in persons being presently in prison.
In refusing to give Linkletter the benefit of the Mapp rule, the Court expresses the view that its "approach is particularly correct with reference to the Fourth Amendment's prohibitions as to unreasonable searches and seizures," indicating a disparaging view of the Fourth Amendment that leaves me somewhat puzzled after Mapp and other recent opinion talking about the indispensable protections of the Amendment. Ante, p. 629. Then the Court goes on to follow a recent pattern of balancing away Bill of Rights guarantees and balances away[3] in great part the Fourth Amendment safeguards one could reasonably have expected from the Mapp opinion and the opinion in Fay v. Noia, 372 U. S. 391, which opened up to collateral attack all unconstitutional convictions even though "final." Even using the Court's own balancing process, however, I think those now in prison under convictions resting on the use of unconstitutionally seized evidence should have their convictions set aside and be granted new trials conducted in conformity with the Constitution.

*646 I.
As the Court concedes, ante, p. 628, this is the first instance on record where this Court, having jurisdiction, has ever refused to give a previously convicted defendant the benefit of a new and more expansive Bill of Rights interpretation. I am at a loss to understand why those who suffer from the use of evidence secured by a search and seizure in violation of the Fourth Amendment should be treated differently from those who have been denied other guarantees of the Bill of Rights. Speaking of the right guaranteed by the Fourth and Fifth Amendments not to be convicted on "unconstitutional evidence," the Court said in Mapp, only four years ago, that:
". . . we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him . . . ." 367 U. S., at 660. (Emphasis supplied.)
Linkletter was convicted on "unconstitutional evidence." He brought this federal habeas corpus proceeding seeking relief from his prior conviction, which this Court held in Fay v. Noia, 372 U. S. 391, was the proper way to challenge a previous conviction unconstitutionally obtained. Evidence used against Noia, however, was not obtained by an unlawful search and seizure but by a coerced confession. Noia's conviction had taken place 21 years before his case reached this Court, and was therefore "final." And in Reck v. Pate, 367 U. S. 433, decided in 1961, this *647 Court set aside the conviction of Reck for a 1936 offense on the ground that a coerced confession had been used against him.
There are peculiar reasons why the Mapp search and seizure exclusionary rule should be given like dignity and effect as the coerced confession exclusionary rule. Quite apart from the Court's positive statement in Mapp that the right guaranteed by the Fourth and Fifth Amendments not to be convicted through use of unconstitutionally seized evidence should be given "like effect as other basic rights secured by the Due Process Clause . . . ," Mapp, like most other search and seizure exclusionary rule cases, relied heavily on Boyd v. United States, 116 U. S. 616. In reaching the conclusion in Boyd that evidence obtained by unlawful search and seizure could not be admitted in evidence, the Boyd Court relied on the Fifth Amendment's prohibition against compelling a man to be a witness against himself. The Boyd Court held that the Fifth Amendment's prohibition against self-incrimination gave constitutional justification to exclusion of evidence obtained by an unlawful search and seizure. The whole Court[4] treated such a search and seizure as compelling the person whose property was thus taken to give evidence against himself. There was certainly nothing in the Boyd case to indicate that the Fourth and Fifth Amendments were to be given different dignity and respect in determining what, when and under what circumstances persons are entitled to their full protection. See One 1958 Plymouth Sedan v. Pennsylvania, 380 U. S. 693, 703 (concurring opinion).
*648 This Court's opinion in Mapp not only by the express language already quoted but in numerous other places treated the two amendments as inseparable from the standpoint of the exclusionary rule. Speaking of the two, the Court said:
"[T]he very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence." 367 U. S., at 657.
Again the Court said in Mapp that:
" `[C]onviction by means of unlawful seizures and enforced confessions . . . should find no sanction in the judgments of the courts . . . .' " Id., at 648.
This statement appearing in Mapp had originally been made in Weeks v. United States, 232 U. S. 383, 392. Weeks, which established the federal exclusionary rule for the first time, did so by relying greatly on the Boyd case and Boyd's treatment of unlawful seizures and enforced confessions as falling into precisely the same constitutional category. Yet the Court today by a chain of circuitous reasoning degrades the search and seizure exclusionary rule to a position far below that of the rule excluding evidence obtained by coerced confessions. The result is that this departure from the philosophy of Mapp denies Linkletter a right to challenge his conviction for an offense committed in August 1958 while it leaves Miss Mapp free because of an offense she committed in 1957.

II.
One reasonperhaps a basic oneput forward by the Court for its refusal to give Linkletter the benefit of the search and seizure exclusionary rule is the repeated statement that the purpose of that rule is to deter sheriffs, policemen, and other law officers from making unlawful *649 searches and seizures. The inference I gather from these repeated statements is that the rule is not a right or privilege accorded to defendants charged with crime but is a sort of punishment against officers in order to keep them from depriving people of their constitutional rights. In passing I would say that if that is the sole purpose, reason, object and effect of the rule, the Court's action in adopting it sound more like law-making than construing the Constitution. Compare Mapp v. Ohio, 367 U. S. 643, 661 (concurring opinion). Both the majority and the concurring members of the Boyd Court seemed to believe they were construing the Constitution. Quite aside from that aspect, however, the undoubted implication of today's opinion that the rule is not a safeguard for defendants but is a mere punishing rod to be applied to law enforcement officers is a rather startling departure from many past opinions, and even from Mapp itself. Mapp quoted from the Court's earlier opinion in Weeks v. United States, supra, certainly not with disapproval, saying that the Court "in that case clearly stated that use of the seized evidence involved `a denial of the constitutional rights of the accused.' " 367 U. S., at 648. I have read and reread the Mapp opinion but have been unable to find one word in it to indicate that the exclusionary search and seizure rule should be limited on the basis that it was intended to do nothing in the world except to deter officers of the law. Certainly no such limitation is implied by the Court's statement in Mapp that without the rule:
"[T]he assurance against unreasonable . . . searches and seizures would be `a form of words,' valueless and undeserving of mention in a perpetual charter of inestimable human liberties . . . ." 367 U. S., at 655.
The Court went on to indicate its belief that the rule was " `implicit in the concept of ordered liberty,' " id., at 655, *650 and that it is an "essential ingredient" of the constitutional guarantee. Id., at 651. If the exclusionary rule has the high place in our constitutional plan of "ordered liberty," which this Court in Mapp and other cases has so frequently said that it does have, what possible valid reason can justify keeping people in jail under convictions obtained by wanton disregard of a constitutional protection which the Court itself in Mapp treated as being one of the "constitutional rights of the accused"?

III.
The Court says that the exclusionary rule's purpose of preventing law enforcement officers from making lawless searches and seizures "will not at this late date be served by the wholesale release of the guilty victims." Ante, p. 637. It has not been the usual thing to cut down trial protections guaranteed by the Constitution on the basis that some guilty persons might escape. There is probably no one of the rights in the Bill of Rights that does not make it more difficult to convict defendants. But all of them are based on the premise, I suppose, that the Bill of Rights' safeguards should be faithfully enforced by the courts without regard to a particular judge's judgment as to whether more people could be convicted by a refusal of courts to enforce the safeguards. Such has heretofore been accepted as a general maxim. In answer to an argument made in the Mapp case, that application of the exclusionary rule to the States might allow guilty criminals to go free, this Court conceded that:
"In some cases this will undoubtedly be the result. . . . The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp v. Ohio, supra, at 659.

*651 IV.
The Court says that:
"To make the rule of Mapp retrospective would tax the administration of justice to the utmost. Hearings would have to be held on the excludability of evidence long since destroyed, misplaced or deteriorated. If it is excluded, the witnesses available at the time of the original trial will not be available or if located their memory will be dimmed. To thus legitimate such an extraordinary procedural weapon that has no bearing on guilt would seriously disrupt the administration of justice." Ante, pp. 637-638.
This same argument would certainly apply with much force to many cases we have heard in the past including Reck v. Pate, supra, and Fay v. Noia, supra. Reck was directed to be given a new trial 25 years after his offense and Noia 21 years after conviction. Both were given relief under just "such an extraordinary procedural weapon" as the Court seems today to inveigh against. Indeed in Noia's case this Court went to great lengths to explain in an exhaustive and in what I consider to be a very notable and worthwhile opinion that habeas corpus was designed to go behind "final" judgments and release people who were held on convictions obtained by reason of a denial of constitutional rights. A glance at the briefs and this Court's opinions in both Reck and Noia will reveal that this Court rejected precisely the same kind of arguments and reasoning that I have just quoted from the Court's opinion justifying its judgment in this case. What the Court held in Noia did not, as the dissenting Justice charged it would, seriously disrupt the administration of justice.[5] It merely opened up to collateral review cases of men who were in prison due to convictions where *652 their constitutional rights had been disregarded. Noia rested on the sound principle that people in jail, without regard to when they were put there, who were convicted by the use of unconstitutional evidence were entitled in a government dedicated to justice and fairness to be allowed to have a new trial with the safeguards the Constitution provides.
Little consolation can be gathered by people who languish in jail under unconstitutional convictions from the Court's statement that "the ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late." Ante, p. 637. Linkletter is still in jail. His claim is no more "too late" than was Noia's.[6]
The plain facts here are that the Court's opinion cuts off many defendants who are now in jail from any hope of relief from unconstitutional convictions. The opinion today also beats a timid retreat from the wholesome and refreshing principles announced in Noia. No State should be considered to have a vested interest in keeping prisoners in jail who were convicted because of lawless conduct by the State's officials. Careful analysis of the Court's opinion shows that it rests on the premise that a State's assumed interest in sustaining convictions obtained under the old, repudiated rule outweighs the interests both of that State and of the individuals convicted *653 in having wrongful convictions set aside. It certainly offends my sense of justice to say that a State holding in jail people who were convicted by unconstitutional methods has a vested interest in keeping them there that outweighs the right of persons adjudged guilty of crime to challenge their unconstitutional convictions at any time. No words can obscure the simple fact that the promises of Mapp and Noia are to a great extent broken by the decision here. I would reverse.
NOTES
[1] Although Mapp may not be considered to be an overruling decision in the sense that it did not disturb the earlier holding of Wolf that the search and seizure provisions of the Fourth Amendment are applicable to the States, its effect certainly was to change existing law with regard to enforcement of the right.
[2] A split of authority has developed in the various courts of appeals concerning the retrospectivity of Mapp. Compare Hall v. Warden, 313 F. 2d 483 (C. A. 4th Cir. 1963) (retroactive); Walker v. Peppersack, 316 F. 2d 119 (C. A. 4th Cir. 1963) (retroactive), California v. Hurst, 325 F. 2d 891 (C. A. 9th Cir. 1963) (retroactive), with Gaitan v. United States, 317 F. 2d 494 (C. A. 10th Cir. 1963) (prospective); Linkletter v. Walker, 323 F. 2d 11 (C. A. 5th Cir. 1963) (prospective); Sisk v. Lane, 331 F. 2d 235 (C. A. 7th Cir. 1964) (prospective); United States ex rel. Angelet v. Fay, 333 F. 2d 12 (C. A. 2d Cir. 1964) (prospective).

About the only point upon which there was agreement in the cases cited was that our opinion in Mapp did not foreclose the question.
The state courts which have considered the question have almost unanimously decided against application to cases finalized prior to Mapp. See, e. g., Beltowski v. Tahash, 266 Minn. 182, 123 N. W. 2d 207, cert. denied, 375 U. S. 947 (1963); Moore v. State, 274 Ala. 276, 147 So. 2d 835 (1962), cert. denied, 374 U. S. 811 (1963); People v. Muller, 11 N. Y. 2d 154, 182 N. E. 2d 99, cert. denied, 371 U. S. 850 (1962).
Commentators have also split over the question of absolute retroactivity. See Bender, The Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 110 U. Pa. L. Rev. 650 (1962); Freund, New Vistas in Constitutional Law, 112 U. Pa. L. Rev. 631 (1964); Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319; Weinstein, Local Responsibility for Improvement of Search and Seizure Practices, 34 Rocky Mt. L. Rev. 150 (1962); Note, Collateral Attack of Pre-Mapp v. Ohio Convictions Based on Illegally Obtained Evidence in State Courts, 16 Rutgers L. Rev. 587 (1962); Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L. J. 907 (1962). Contra, Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201 (1965); Meador, Habeas Corpus and the "Retroactivity" Illusion, 50 Va. L. Rev. 1115 (1964); Torcia & King, The Mirage of Retroactivity and Changing Constitutional Concepts, 66 Dick. L. Rev. 269 (1962).
[3] It has been suggested that this Court is prevented by Article III from adopting the technique of purely prospective overruling. Note, 71 Yale L. J. 907, 933 (1962). But see 1A Moore, Federal Practice 4082-4084 (2d ed. 1961); Currier, supra. n. 2, at 216-220. However, no doubt was expressed of our power under Article III in England v. Louisiana State Board of Medical Examiners, 375 U. S. 411 (1964). See also Griffin v. Illinois, 351 U. S. 12, 20 (1956) (concurring opinion of Frankfurter, J.).
[4] Ker v. California, 374 U. S. 23 (1963); Fahy v. Connecticut, 375 U. S. 85 (1963); Stoner v. California, 376 U. S. 483 (1964).
[5] By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in Mapp v. Ohio.
[6] "I know of no authority in this court to say that in general state decisions shall make law only for the future. Judicial decisions have had retrospective operation for near a thousand years." Kuhn v. Fairmont Coal Co., 215 U. S. 349, 372 (1910) (dissenting opinion of Holmes, J.).
[7] While Blackstone is always cited as the foremost exponent of the declaratory theory, a very similar view was stated by Sir Matthew Hale in his History of the Common Law which was published 13 years before the birth of Blackstone. Gray, Nature and Sources of the Law 206 (1st ed. 1909).
[8] It is interesting to note, however, that as early as 1801, Chief Justice Marshall in United States v. Schooner Peggy, 1 Cranch 103, had made clear that

"if subsequent to the judgment [in the trial court] and before the decision of the appellate court, a law intervenes and positively changes the rule which governs . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment . . . which cannot be affirmed but in violation of law, the judgment must be set aside." At 110.
Petitioner maintains that this case establishes a rule of absolute retroactivity and that the principle is the same with regard to constitutional rights. Respondent, on the other hand, maintains that the case stands for the proposition for which he contends, i. e., that a change in the law will be given effect while a case is on direct review, but cannot be necessarily invoked on collateral attack.
[9] "Because this was a criminal prosecution, it builds not only upon the cases which followed Schooner Peggy but also upon the principle, established at common law, that repeal of a penal statute prohibits prosecution of acts committed before the repeal if those acts had not yet been prosecuted to final judgment. The repeal is regarded as an indication that the state no longer wants such acts punished, regardless of when they took place, and no longer views them as criminal." Note, 71 Yale L. J. 907, 914 (1962).
[10] This was a diversity case in which this Court held that the doctrine of Schooner Peggy, in effect, was incorporated in Eric R. Co. v. Tompkins, 304 U. S. 64. "A federal court sitting in a diversity case must therefore apply the most recent state court decision, even if it came after the operative events or the entry of judgment by a lower court." Note, 71 Yale L. J. 907, 915 (1962). See, e. g., Blaauw v. Grand Trunk Western R. Co., 380 U. S. 127 (1965).
[11] Accord, Carpenter v. Wabash R. Co., 309 U. S. 23 (1940) (intervening statutory change); Vandenbark v. Owens-Illinois Glass Co., 311 U. S. 538 and cases cited at 541-542 (1941); Dinsmore v. Southern Express Co., 183 U. S. 115, 120 (1901) (intervening statutory change); Crozier v. Krupp, 224 U. S. 290, 308 (1912) (intervening statutory change).
[12] There was no mention of prospective overruling in the opinion, however three Justices voted to overrule Wilcox but reversed James' conviction because "the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was committed." 366 U. S. 213, 221-222. MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concurred in the reversal of the conviction on the basis that Wilcox was right and therefore failure to include embezzled funds in taxable income was not a crime. However, MR. JUSTICE BLACK strongly disagreed with the prospective manner in which the overruling was done.

"[O]ne of the great inherent restraints upon this Court's departure from the field of interpretation to enter that of lawmaking has been the fact that its judgments could not be limited to prospective application. This Court and in fact all departments of the Government have always heretofore realized that prospective lawmaking is the function of Congress rather than of the courts. We continue to think that this function should be exercised only by Congress under our constitutional system." 366 U. S., at 225.
Compare the dissenting opinion of MR. JUSTICE BLACK in Mosser v. Darrow, 341 U. S. 267, 275 (1951), where he stated that a new rule of trustee liability should not be applied retroactively. For discussion of these cases see Currier, supra, n. 2; Note, 71 Yale L. J. 907.
[13] Eskridge v. Washington Prison Board, 357 U. S. 214 (1958), applied the rule of Griffin v. Illinois, 351 U. S. 12 (1956), requiring the State to furnish transcripts of the trial to indigents on appeal, to a 1935 conviction. The rule in Gideon v. Wainwright, 372 U. S. 335 (1963), that counsel must be appointed to represent an indigent charged with a felony, was actually applied retrospectively in that case since Gideon had collaterally attacked the prior judgment by post-conviction remedies. See also Doughty v. Maxwell, 376 U. S. 202 (1964). Jackson v. Denno, 378 U. S. 368 (1964), involving a coerced confession, was also applied to the petitioner who was here on a collateral attack. See also McNerlin v. Denno, 378 U. S. 575 (1964). It is also contended that Reck v. Pate, 367 U. S. 433 (1961), supports the conclusion of absolute retroactivity in the constitutional area since the petitioner convicted in 1937 was released after a finding that the confession was coerced when judged by standards set forth in our cases decided subsequent to his conviction. See United States ex rel. Angelet v. Fay, 333 F. 2d 12, 24 (dissenting opinion of Marshall, J.).
[14] Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358, 364 (1932) (referring to state court's prospective overruling of prior decision).
[15] See Mapp v. Ohio, 367 U. S. 643, 661-662 (1961) (concurring opinion of BLACK, J.).
[16] There the Court detailed the lineup of the States on the exclusionary rule before and after Weeks pointing out that at the time of the decision 31 States rejected the rule and 16 States were in agreement with it.
[17] In an Appendix to the opinion, the lineup of States regarding the exclusion of illegally seized evidence was catalogued, indicating that there was some change since Wolf26 States excluded such evidence while 24 did not. At 224-225.
[18] See cases cited in n. 13, supra.
[19] Indeed, MR. JUSTICE BLACK in concurring said "that the federal exclusionary rule is not a command of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate." 338 U. S. 25, at 39-40.
[20] In Griffin v. Illinois, supra, the appeal which was denied because of lack of funds was "an integral part of the [State's] trial system for finally adjudicating the guilt or innocence of a defendant." At 18. Precluding an appeal because of inability to pay was analogized to denying the poor a fair trial. In Gideon v. Wainwright, supra, we recognized a fundamental fact that a layman, no matter how intelligent, could not possibly further his claims of innocence and violation of previously declared rights adequately. Because of this the judgment lacked reliability. In Jackson v. Denno, supra, the holding went to the basis of fair hearing and trial because the procedural apparatus never assured the defendant a fair determination of voluntariness. In addition, MR. JUSTICE WHITE expressed grave doubts regarding the ability of the jury to disregard a confession found to be involuntary if the question of guilt was uncertain.
[1] Holmes, The Common Law 5 (Howe ed. 1963).
[2] Adkins v. Children's Hospital, 261 U. S. 525, 568 (dissenting opinion).
[3] See United States ex rel. Angelet v. Fay, 333 F. 2d 12, 27 (dissenting opinion of Judge Marshall).
[4] Mr. Justice Miller, joined by Chief Justice Waite, agreed with the Court that the Fifth Amendment barred use at a trial of evidence obtained through a subpoena compelling production of a man's private papers to be used in a criminal prosecution of him; Mr. Justice Miller did not agree that a statute authorizing such a subpoena violated the Fourth Amendment. Boyd v. United States, 116 U. S. 616, 638.
[5] See Fay v. Noia, 372 U. S. 391, 445 (CLARK, J., dissenting).
[6] "Surely no fair-minded person will contend that those who have been deprived of their liberty without due process of law ought nevertheless to languish in prison. Noia, no less than his codefendants Caminito and Bonino, is conceded to have been the victim of unconstitutional state action. Noia's case stands on its own; but surely no just and humane legal system can tolerate a result whereby a Caminito and a Bonino are at liberty because their confessions were found to have been coerced yet a Noia, whose confession was also coerced, remains in jail for life. For such anomalies, such affronts to the conscience of a civilized society, habeas corpus is predestined by its historical role in the struggle for personal liberty to be the ultimate remedy." Fay v. Noia, 372 U. S. 391, 441.